ETHEL KATZ, Respondent, v. NORTH KANSAS CITY DEVELOPMENT COMPANY, Appellant.*

In the Kansas City Court of Appeals, February 11, 1924.

1. **PLEADING: Admission: Answer Held to Impliedly Admit That Deceased Fell from a Certain Floor.** In an action to recover damages

for death of husband, who fell down an elevator shaft, where petition charged that doors thereof were left open at first floor and defendant's answer alleged that deceased "could have ascertained whether or not the elevator was on the first floor of the building before stepping through the door," *held* sufficient to show what floor deceased fell from and that the answer impliedly admitted that deceased fell from the first floor.

2. ———: ———: **Answer Held not to Admit That Doors to Elevator Were Open.** Where answer alleged deceased knew "or could have ascertained whether or not the elevator was on the first floor of the building before stepping through the door," *held* not an admission that the doors to elevator were open.

3. **NEGLIGENCE: Evidence of Negligence in Leaving Doors to Elevator Shaft Open Held Insufficient for Submission to Jury.** In an action to recover damages for death of husband who fell into an elevator shaft from first floor, evidence of plaintiff *held* to show that doors of elevator shaft were closed by two men who had gone up on the elevator from first to third floor a short time before deceased fell, and insufficient to take case to the jury on question of defendant's negligence in leaving elevator doors open, in absence of evidence that they were opened before deceased fell, by anyone for whose act defendant would be liable, though they were found open thereafter.

4. **NEGLIGENCE: General Demurrer to Evidence Held Improperly Overruled Where There Was no Evidence of Negligent Act Which Constituted Gist or Essence of Wrong Done and Only Basic Cause of Injury, Though There Were Other Allegations of Negligence.** Where evidence showed a short time before deceased fell down elevator shaft, the doors thereof were closed, and there was no evidence that anyone for whose act the defendant was responsible opened them, or negligently left them open, that the petition in addition to charging that the elevator doors were negligently left open also alleged that the place was not sufficiently lighted and that the inside of the shaft was painted black, did not cure error of trial court in overruling defendant's demurrer to the evidence, though it was general and no instructions were asked by defendant seeking to withdraw any of the specified grounds of recovery, the negligence as to opening of doors and leaving them open being the gist or essence of the wrong done and only basic cause of injury, and the other so-called specifications of negligence not forming separate, independent or complete causes of action.

5. ———: **Before Plaintiff Was Entitled to Verdict Jury Was Required to Find Doors of Elevator Shaft Were Negligently Left Open by Someone for Whose Act Defendant Was Responsible.** In an action for death of plaintiff's husband, who fell into an elevator shaft from a floor at which the doors thereof were closed a few minutes

before deceased's fall by persons going up on the elevator, a so-called dangerous custom of persons on floors above to bring up the elevator by pulling the rope without knowing whether the doors at the floor below from which it was brought were open or closed, *held* that before plaintiff was entitled to recover she was required to prove that the doors of the shaft had been negligently opened or left open by defendant or someone for whose act defendant was responsible.

6. ———: **Opening Elevator Doors and Stepping into Shaft Without Looking Held Negligence.** If deceased opened elevator doors and stepped into shaft without first ascertaining whether the elevator was at the floor from which he fell, he was negligent.

7. ———: **Presumption of Due Care: Burden of Proof: Presumption of Due Care on Part of Plaintiff's Decedent Did Not Relieve Plaintiff of Burden of Proving Negligence.** The presumption of due care on the part of deceased does not supply the place of evidence of defendant's negligence, nor relieve plaintiff of the burden of proving such negligence.

8. **DEMURRER: Evidence of Dangerous Practice and Custom, Neither Pleaded or Submitted as an Issue to Jury, Held Insufficient to Justify Court in Overruling Demurrer to Evidence.** Evidence relied upon to establish a dangerous practice or custom of moving elevator, testified to by plaintiff's witnesses only, which was neither pleaded nor submitted as an issue to jury, *held* insufficient to justify court in overruling defendant's demurrer to the evidence and as insufficient to submit to jury the question of the specific negligence alleged.

9. ———: **After Overruling of General Demurrer, Request for Instructions by Defendant, Which Were Given, Was not an Admission by Defendant That There Was Sufficient Evidence to Take Case to Jury.** Where there were several specifications of negligence, but one efficient negligent act charged that of leaving doors open and shaft unguarded, the overruling of a general demurrer to plaintiff's evidence, where no instructions were requested for elimination of unproved grounds of recovery, cannot be upheld, and defendant thereafter by asking and having court give its instructions to jury did not admit thereby that there was sufficient evidence to take case to the jury.

10. **DEATH: Presumption of Care: Slight Circumstances May Overcome Presumption of Freedom from Negligence.** Very slight circumstances may overcome the presumption of deceased's freedom from negligence.

11. ———: ———: **Presumptions Have no Place in Presence of Actual Facts.** Presumptions, such as deceased's freedom from negligence, have no place in the presence of actual facts disclosed to jury.

12. ———: ———: Instructions: Instruction as Presumption of Ordinary Care on Part of Decedent Held Erroneous as Ignoring Certain Facts. In an action for damages for death of plaintiff's husband, who was killed by falling into elevator shaft, an instruction that as no eye witness has testified as to what plaintiff's husband did after entering building, the law presumes that he exercised ordinary care for his own safety, *held* erroneous as ignoring the fact of deceased's expressed unwillingness to wait for and his intention of going to hunt up person for whom he had inquired, it being a grave question under the circumstances of his unwillingness to wait and of his announced intention whether plaintiff was entitled to any instruction on presumption of due care.

13. **APPEAL AND ERROR:** Under Circumstances Held Case Should be Remanded in Order That Plaintiff Might Present Her Case if Sufficient Evidence of Negligence be Available. Where it was insisted case was one for reversal without remanding, *held* under circumstances the case should be remanded in order that plaintiff may present her case for death of her husband if sufficient evidence of negligence be available.

*Headnote 1. Negligence, 29 Cyc, p. 585; 2. Negligence, 29 Cyc, p. 585; 3. Negligence, 29 Cyc, p. 638; 4. Negligence, 29 Cyc, p. 628 (1926 Anno); 5. Negligence, 29 Cyc, p. 597; 6. Negligence, 29 Cyc, p. 513; 7. Negligence, 29 Cyc, p. 600; 8. Negligence, 29 Cyc, p. 628 (1926 Anno); Trial, 38 Cyc, p. 1547; 9. Trial, 38 Cyc, p. 1550; 10. Death, 17 C. J., Section 175 (1926 Anno); 11. Evidence, 22 C. J., Section 88; 12. Death, 17 C. J., Section 182; Trial, 38 Cyc, p. 1632; 13. Appeal & Error, 4 C. J., Section 3098.

Appeal from Circuit Court of Jackson County.—*Hon. Allen C. Southern,* Judge.

REVERSED AND REMANDED.

*Gamble, Trusty & Pugh* for respondent.

*Cyrus Crane* and *Kenneth M. De Weese* for appellant.

TRIMBLE, P. J.—Defendant owns and operates a warehouse known as the Rumley Building in North Kansas City. Plaintiff's husband fell down an elevator shaft therein and was killed. She brought this action to recover damages alleging that his death was caused by

defendant's negligence. The jury returned a verdict in plaintiff's favor for $3000 · and defendant has appealed.

The petition charged that:

(a) "although the elevator opening or shaft through which the deceased fell was on the first floor and in the south end of the building and about midway from the east wall to the west wall and where customers, including the plaintiff, would pass when entering or leaving said building, yet the defendant carelessly and negligently failed to have said place in and around said elevator reasonably sufficiently lighted and negligently left or permitted the entrance to said elevator to be opened and unguarded and by reason thereof it was not reasonably safe."

(b) "although the opening in said elevator shaft was along and near other openings or doors along the south wall of said building and although the interior of the shaft of said elevator was enclosed and dark, and although there was a regular passageway along said opening which defendant allowed, invited and permitted its customers and employees to use said elevator and to pass along said place and knew that such persons passed in dangerous proximity to said elevator opening, and defendant maintained metal doors at said elevator opening for the purpose of closing and guarding the same, yet the defendant carelessly and negligently caused or allowed the doors to said elevator opening to be open and the same to be unguarded when it knew or by the exercise of ordinary care might have known that said place was not reasonably safe when said doors were open and said shaft unguarded."

(c) "although it is the usual and general custom to have such elevator openings barricaded or equipped with doors and the doors thereof closed when the elevator is not at such opening, yet the defendant carelessly and negligently caused or allowed the doors to· said elevator to be open at the first floor thereof at a time when the

plaintiff's deceased fell therein although the elevator had been moved and was higher up in the shaft when it knew, or by the exercise of ordinary care could have known that by reason of such facts said place was not reasonably safe.''

(d) ''although said opening was where customers would pass and was near other openings or doors and said place was not sufficiently lighted and the entrance thereof was open and not barricaded, yet the defendant negligently failed to have any light or warning or sign to indicate that said opening was into an elevator shaft and by reason thereof the same was dangerous and not reasonably safe.''

(e) ''although the defendant allowed and invited its customers to use said elevator in going from floor to floor and said customers would use said elevator by getting thereon and setting the same in motion by pulling on the cable, yet the defendant had the elevator shaft painted a dark or black color and failed to maintain any light in said shaft and by reason thereof it was difficult to discover the absence of said elevator in the floor where you desired to enter and by reason thereof the place was dangerous and not reasonably safe.''

The answer was a general denial coupled with a plea of contributory negligence in that plaintiff's husband— ''knew, or by the exercise of ordinary care and prudence on his part, could have ascertained whether or not the elevator was on the first floor of the building before stepping through the door to the elevator shaft, and was careless in not making any such attempt to do so, without first ascertaining or attempting to ascertain whether the elevator was there or not, and in failing to make such attempt was negligent as a matter of law.''

The warehouse is a four-story building 286 feet long, north and south, by 114 feet wide, east and west. Heavy freight and automobiles were stored therein. The office, stairway, entrance doors, and elevators are in the rear or south end of the building. The office, located in the

southeast corner, occupied twenty-two feet and nine inches of the width of the building. West of the office was a space twenty-two and one-half feet in width, and opening into this space through the south wall of the building was a large entrance door. Immediately west of the above twenty-two and one-half foot space, the freight elevator, passenger elevator and stairway occupied another twenty-two and one-half feet of the width of the building, and immediately west of the freight elevator was a space of twenty-two and one-half feet used for a driveway, and opening into this driveway through the south wall of the building was another large entrance door. The passenger elevator is north of the stairway, the latter being near the south wall of the building, and west of the passenger elevator and stairway, forming the west boundary of both, is a wall and immediately west of this wall is the freight elevator.

As the street was on the west side of the building, many persons, and perhaps most of them, entering the building from the dock would go through the large entrance west of the freight elevator, pass north to the north side thereof and then turn east along the north sides of the two elevators and go to the office, or, if desiring to use either the passenger elevator or the stairway, would turn and go south along east of the passenger elevator and either enter the elevator or continue on a very short distance south to the stairway.

Outside and south of the south wall of the building is a large loading dock on which automobiles or property for storage could be driven or loaded and then taken into the building through the large door and, on being placed on the freight elevator, could be taken to any floor of the warehouse desired.

Each elevator had gates or doors to its entrance and these were so constructed as to divide into two parts, an upper and lower half. They open at the dividing line between the two halves, the lower half descending until its upper edge was flush with the floor, and the upper half

ascending until it was out of the way. When the gate closed, the two halves came together and formed a solid wall, but sometimes in closing they rebounded a little, leaving a horizontal aperture varying from two to six inches or more wide between the two halves, but as this aperture was half way up the entire height of the door, the opening thus left did not prevent the door from guarding the entrance to the elevator shaft.

Defendant maintained one man in the warehouse who attended to the work of deciding where freight and automobiles should be stored and of operating the elevators in the building. His name was Storms. Patrons desiring to store freight or automobiles would go into the office to see Storms and get directions from him as to where their property was to be placed, and, accompanied by him, would take the stuff to the designated parts of the building by means of the freight elevator.

For about two years prior to the injury, plaintiff's husband, with his partner, Dolgenow, had been accustomed to, at least once a month and oftener, take automobiles from their garage in Kansas City to this warehouse and store them there. They were, therefore, familiar with the premises.

Somewhere around three or four o'clock in the afternoon of December 30, 1919, the two men, Dolgenow and plaintiff's husband, Katz, each drove a Ford car onto the dock for the purpose of storing them in the warehouse. Dolgenow got out of his car and went into the office, through a door in the south wall opening directly into the office, to inquire for Storms. He learned in some way that Storms was on the second or third floor but would be down in five or ten minutes. Dolgenow went back to the dock where plaintiff's husband and several other persons were waiting. Dolgenow reported what he had learned and when Storms would be down, whereupon Katz said, "It will be too long to wait for him. I will go and look for him."

Katz then went into the building through the large entrance door west of the freight elevator. No one knows

what he did therein and there was no eyewitness to the accident.

It was "but a few minutes" after Katz entered the building until those waiting on the dock heard a cry that some one had fallen into the elevator shaft. They all ran into the building through the entrance used by Katz.

Dolgenow says that he first looked at the freight elevator doors but they were closed and that he ran on around to the passenger elevator; that the elevator was not there, but was somewhere on a floor above; that the doors to the elevator were open "all the way;" that it was a gloomy day and in the building "it wasn't dark like at night but it was dark." It was dark in the elevator shaft so that one couldn't see a thing looking into the shaft. He said that when he was trying to see he meant they were standing at the first floor looking down into the shaft; that a call was made for matches and they ran down into the basement, but without matches they could not see into the elevator pit, the bottom of which was three or four feet below the basement floor; that when they got matches and struck them they found Katz lying on the bottom of the passenger elevator pit; that they got him out and a doctor was sent for but he pronounced the case hopeless and Katz died shortly after and without making any statement.

On cross-examination Dolgenow said that when he got to the passenger elevator the doors thereto were open and the elevator wasn't there; that he "could see a little" and could see that the doors were open and the elevator was not there; that he went to the edge of the hole and looked down in there and it was very dark and he couldn't see what was down in the hole, but that he could see when he came up to the door that the passenger elevator wasn't there; that he and Katz had gone up the stairway a number of times, and had gone up and down on the passenger elevator but never by themselves, they had always gotten Storms to take them up or down, and the same was true as to the freight elevator; that when they

heard the alarm, others went with him to the passenger elevator and with him looked down into the shaft but no one was at the elevator shaft when he first got there; that both he and Katz had, a great many times, gone into the building and to the office over the route above indicated, that is, from the door west of the freight elevator around to the office, and back again; that on these occasions as they passed, the passenger elevator door was closed, and he had never seen it with the door standing open; that it was about ten minutes from the time he himself went into the building until he heard the cry that some one had fallen into the elevator shaft.

Later Dolgenow returned to the stand and testified that he could not tell whether the elevator was there at the first floor or not until he struck some matches and looked and that he struck some on the first floor. However, he still said he could tell that the doors were open but couldn't see whether the elevator was there until matches were struck.

Deines, then an employee of the Jones-Thorp Motor Company who also stored property there, testified that he was at the building when Katz was killed, that he had many times seen Storms use the freight and passenger elevators, and had himself gone up and down the stairway without Mr. Storms, but had never used the elevator without Mr. Storms; that when they would go to the elevator, if the doors weren't open, Storms would open them and call for the elevator once or twice and if no one answered he would reach in, pull the rope and bring the elevator down to him; that at times he had gone with Storms to the elevator when it was *at the first floor,* and on these occasions sometimes the doors would be open and sometimes closed and "a lot of times" there would be a space of one or two feet between them; that on the day of the accident the doors were open when he got to the elevator; that a few times he had been on third floor with Storms when he would pull on the rope and bring the elevator up to him.

Deines further testified that he went to the warehouse about 3 or 3:30 o'clock the afternoon of Katz's injury; that he went through the door west of the elevator around to the office, saw Storms and, in company with a co-employee, a colored man named Jackson, went with Storms to the passenger elevator; that the doors to the elevator were open but the elevator was not there, he could "see that much easy enough;" that Storms reached in and pulled the rope and brought the elevator down to the first floor and when it reached there Storms stopped it by pulling on the rope.

Deines further testified that the three then got on the elevator and the doors to the elevator were pulled together but they rebounded or sprung apart about a foot, but this, of course, left the whole door space filled except the foot space in the middle of the doors; that they went up to the third floor and got off, leaving the elevator standing there and went to the north end of the building; that when they got through with their purpose in going there they came back and went to the freight elevator but as it was not on the third floor they called down for it but some one below hollered that a man had fallen into the shaft, and they went to the passenger elevator but it was not where they had left it but was at the second floor; how it got there he did not know, they had shortly before left it at the third floor; that the three ran down to the basement, Deines arriving there first, and they got Katz out; that the door to the passenger elevator in the basement was wide open; that when the three men, after completing their work on the third floor went back to where they had shortly before left the passenger elevator standing, the doors thereto were wide open; that as he went down into the basement and when he afterwards came out he paid no attention to the passenger elevator doors on the first floor, the only time he saw them was when the three went up to the third floor and closed the doors behind them, they were closed with the rebound heretofore stated.

Jackson, the colored man who went with Storms and Deines to the third floor, testified that he and Deines got to the warehouse somewhere about half an hour before Katz was killed; that when the three went from the office to the passenger elevator to go to the third floor, the elevator was not at the first floor and the doors were open about a foot through which space Storms reached in and pulling a cord brought the elevator to the first floor, he didn't know which way the elevator came.

Jackson also swears that after they got on the elevator the doors were pulled to and they went on up to the third floor; that when they got to the third floor they left the elevator there and left the doors thereto open; that they worked at the north end of the building about twenty minutes and then the three returned to the elevator, he in advance of the other two; that the passenger elevator was not there and he called down the freight elevator shaft for the latter and some one called from below not to pull the rope as a man was in the shaft; that people in going from the door west of the freight elevator around to the office would pass in from four to six feet of the passenger elevator door.

The foregoing was the testimony of plaintiff's witnesses and at the conclusion of plaintiff's evidence the defendant offered a demurrer thereto which the court overruled. The defendant stood on the demurrer and offered no testimony.

Before considering the points involved in the case, it is well to dispose of some preliminary matters which should be first set at rest. Although defendant contends that there is nothing to show what floor deceased fell from, yet we think we may rightfully treat the case on the theory that he fell from the first floor. Dolgenow said "it was but a few minutes" after Katz entered the building until he heard the alarm given that a man had fallen into the elevator shaft. Consequently, the inference might be permissible that Katz had not had time to get to any other floor and fall therefrom. But, however this may be, the petition in several of its specifications

215 Mo. Sup.—43.

mentioned the passageway along and in front of the elevator, and manifestly this was on the first floor and was the one referred to, and in specification (c) the petition specifically charged that the defendant "carelessly and negligently caused or allowed the doors to said elevator to be open *at the first floor*" etc. And defendant's answer, in pleading contributory negligence, stated that deceased knew, or by the exercise of ordinary care "could have ascertained whether or not the elevator was *on the first floor* of the building before stepping through the door" etc. It would seem that the answer at least impliedly admits that deceased fell from the first floor. However, it cannot be said, as plaintiff claims, that the answer admits the doors to the elevator were open.

Proceeding now to the question of liability, it will be observed that when Dolgenow, upon hearing the alarm, ran into the building and to the elevator, the doors thereof were open and the elevator was not there; that a short time before the injury Storms had gone on the elevator from the first to the third floor, with the two men, Deines and Jackson, both of whom were plaintiff's witnesses and both of whom testified that the doors were closed and left closed as they went up. It is true, Deines says the doors, after closing, rebounded until they were about a foot apart, while Jackson said they were closed, but even if they were left a foot apart at the horizontal line between the two halves, the doors would still constitute a guard to the elevator, preventing one from getting into the shaft until he had opened the doors further or fully. So that, according to plaintiff's own evidence, the doors to the elevator at the first floor were not open but were closed and left closed by the three men shortly before Katz's fall. And there is no testimony anywhere in the record tending to show that anyone opened them after Storms and the men closed them. They were, it is true, found open after Katz's fall, but this does not show that they were opened by anyone for whose act the defendant would be liable.

To meet this situation, plaintiff apparently takes the position that several different specifications of negligence were set out in the petition, and as defendant's demurrer was general and no instructions were asked by it seeking to withdraw any of the specified grounds of recovery, the trial court cannot be convicted of error in overruling the demurrer; also that a custom or practice in reference to the operation of the elevator was shown, from which the jury could say that the injury resulted from such custom or practice, and, therefore, it was not necessary to prove a particular negligent act on the part of anyone for whom the defendant is responsible.

With reference to the first part of this contention, namely, that there are several different specifications of negligence charged, it is apparent that, in the very nature of things, the so-called different specifications do not form separate, independent, or complete causes of action. The gist or essence of the wrong done, and the only basic cause of the injury, is the negligent opening of the doors and leaving them open. While the petition charges that the place was not sufficiently lighted and that the inside of the elevator shaft was painted black, yet these things would not constitute a cause of action *if the elevator doors were closed.* The doors being *open* is the wrong which would result in injury; if they were *open* then the lack of light and the dark-painted shaft would very likely assist in bringing about the injury and would tend to relieve the deceased of the charge of contributory negligence. But if the doors were *closed,* then not only would these other things be wholly insufficient, of themselves, to produce the injury, but they would clearly convict the deceased of contributory negligence if he opened the doors himself and attempted to enter before ascertaining whether the elevator was there or not. So that, although the petition states the charge in several different specifications, yet the real and efficient wrong charged is the negligent opening of the doors and leaving them open; and the only hope of recovery

must rest on the doors being open. That this is the basis of the cause of action is shown not only in the pleading but also by the instruction on which plaintiff submitted her case. It required the jury to find—"that the doors of said passenger elevator shaft at the first floor were open when the plaintiff's husband approached or attempted to pass by said elevator shaft and that the elevator was not at said floor" and that—"the defendant failed to exercise such care as would be exercised by ordinarily careful and prudent persons under the same or similar circumstances to keep the doors to said shaft closed and to furnish or provide said place with reasonably sufficient light and that because of such failure on the part of defendant, if it did so fail, said doors were open and said place was insufficiently lighted and that plaintiff's husband was caused to fall through said shaft and to lose his life, then you will find for plaintiff," etc.

Consequently, before plaintiff was entitled to a verdict the jury had to first find that the doors of the elevator shaft were open and had been negligently opened or left open by defendant or some one for whose act it was responsible. But plaintiff's own evidence shows that, a few minutes before the accident, the doors were *closed*, and there is *no evidence* that anyone for whose act the defendant is responsible opened them or negligently left them open. And here is where plaintiff relies upon the above mentioned practice or custom to supply the place of this lack of evidence. That so-called custom was that Storms, at whatever floor he was on, would go to the elevator shaft and, opening the doors or pulling them apart, would, by pulling the rope, bring the elevator to the floor he was on without knowing whether the doors at the floor from which it was brought were open or closed, and that others when in the building and desiring to use the elevators were allowed to do this. The inference plaintiff seemingly desires to draw from this is that such was a *dangerous* custom or practice, and

in view thereof, some one in the building must have sought to move and use the elevator after Storms had left it at the third floor, and, in so attempting to use it, had opened and left open the doors at the *first floor*. Of course, to find this, the jury would have to find that some one at the first floor pulled the rope and brought the elevator down to that floor and then entered the elevator, going up to the second floor and leaving the doors the first floor open. (Plaintiff in her brief impliedly concedes that the jury would have to so find, for she suggests that that is what likely occurred.) If a dangerous custom or habitual practice existed, and the doors at the first floor were opened and left open in the manner suggested, then doubtless the defendant would be liable even though it did not know the doors had been opened at this particular time and even though the one who did it was not a servant of defendant for whose act defendant would otherwise be responsible.

It would seem that the reliance upon the so-called practice or custom to take the place of evidence in the particular hereinabove stated, would require the inference that the elevator was by some one brought to the first floor, and another inference that upon the elevator reaching the first floor, this unknown supposititious person opened the doors and entered the elevator, and a still further inference that he then went with the elevator up to the second floor and left the doors at the first floor open. If so, then this is piling inference upon inference with a vengeance, which, of course, is not permissible.

But leaving this question for a moment, it should be observed that such a practice of pulling the elevator from one floor to another would be dangerous only in case the doors at the floor from which the elevator was brought, were left open. If they were closed, there would be no danger in pulling the elevator to another floor. Of course, if the elevator were allowed to stand at the first floor with the doors open, and a person on an upper floor were allowed to pull it up to him, this would result in leaving the elevator shaft unguarded and would create a

dangerous situation. But plaintiff's own evidence does not present such a case. If it did, the jury would have to draw but one inference, namely, that some one unstairs took the elevator from the first floor leaving the shaft at the first door empty and open. But the elevator was at the third floor, having gone there from the first floor a few minutes before the fall and the gates were left closed. So that in order to get the benefit of the so-called practice or custom, the jury are called upon to infer that the elevator was brought from the third floor to first floor, that some one then opened the doors and went up to the second floor and that he left the doors at the first floor open.

Again, before the jury could say that a method of using the elevators caused the doors to be left open on this occasion, the method must be shown to have been at least *habitual,* and as heretofore stated the danger would be in leaving the doors open. As to the practice or custom of leaving the elevator at the first floor with the doors open, Dolgenow, who had been going there frequently for two years, testified that the doors were closed when he was there. Deines testified that when the elevator was at the first floor, *sometimes* the doors would be open, but the only time he ever saw the elevator doors at the first floor open when the elevator was not there was the day of the accident and after it had occurred; and although he said that Storms, when upstairs, would pull the elevator up to him, yet it developed that this was merely "a few times." He would not say it was many, and it was not shown on those occasions whether the doors at the floor from whence the elevator came were open or closed. Deines did say that when he and Storms and Jackson went to the elevator shaft at the first floor on their way to the third floor, the elevator was not there and the doors were open and Storms *reached in* and pulled the rope, bringing the elevator down. How much open they were he does not state. But Jackson does, and says they were open about a foot, and this is what Deines must have meant when he said they were open,

for as heretofore observed, he testified on cross-examination that he had never seen the doors open and the elevator not there until the day of the accident and after it occurred.    Even if the doors were open a foot this would still render the doors a guard to the elevator shaft. While there is evidence that occasionally men, bringing in goods for storage or perhaps seeking to take them away, would ask Storms' permission to use the elevator, and obtained it, there is no evidence that the doors were left open or that they, when upstairs, would pull the elevator from the first floor up to them, leaving the shaft open and unguarded.  Hence it is exceedingly doubtful if any *dangerous, habitual* practice or custom was shown. But, as we have said, even if the evidence were such that a jury might find that such custom existed and that it was dangerous, still, under the circumstances in which plaintiff's own evidence places this case, we are unable to see how a custom can be relied upon to supply the lack of evidence as to defendant's negligence, without piling inference upon inference, until the finding becomes mere guess work or conjecture.

Plaintiff's case is wholly unlike that of Bodenmueller v. Columbia Box Co., 237 S. W. 879.   There, the evidence showed who opened the trapdoor into which the plaintiff fell.   It was a man whose duty it was to go down below to adjust the belt.    In other words the evidence showed the trapdoor was opened by a man in the performance of his duty as an employee of the defendant and hence it made no difference  if the  trapdoor was opened only a few moments before the plaintiff fell through it.   In the case at bar, the evidence is doors were closed shortly before deceased fell into shaft and for aught that is known or shown, deceased may have opened them himself and fell in.  If they were closed deceased was negligent if he did not first ascertain whether the elevator was there before stepping in.

The case is far more like, and within the principle announced in, the case of Hake v. Buck's Stove and Range Co., 234 S. W. 1061.  Indeed, the case at bar is

weaker for plaintiff than the Hake case, for in the latter the elevator floor was used as a passageway and the elevator had been in its place but was shown to have been removed therefrom shortly before the deceased fell, while in the case at bar the elevator was not on the first floor but had been taken to the third floor and the doors at the first floor had been closed.    It was nevertheless held in the Hake case that unless the gate was shown to be *habitually* open, or was opened by defendant or some one for whose act defendant was responsible, there could be no recovery.  Again, if it had been shown in the Hake case that the doors were *habitually* left open, the jury would not have been required to draw but one inference therefrom, since there was evidence that the elevator was, shortly before the fall, moved from the place where it formed a part of the passageway, leaving the shaft open and unprotected.  In the case at bar, it is necessary, in order to make use of any habitual practice or custom, ·to *get the elevator back down to the first floor* and then *get it away from there with the gates left open.*  In this respect, and by reason of the fact that plaintiff's own evidence shows that the gates were closed before the fall, the case at bar likewise differs materially from the case of Baldwin v. Hanley, etc., Co., 216 S. W. 998.

If deceased is entitled to the presumption of due care, under the circumstances of this case, still such presumption does not supply the place of evidence of defendant's negligence.  "It is not a presumption of defendant's negligence but one of deceased's freedom from contributory negligence.  It does not relieve plaintiff of the burden of proving defendant's negligence.  One presumption cannot be based on another."   [Menteer v. Scalzo Fruit Co., 240 Mo. 177, 186.]

Furthermore the evidence relied upon to establish a dangerous practice or custom of moving the elevator, comes from plaintiff's witnesses only, and the existence of any such custom was neither pleaded nor submitted as an issue to the jury.  Plaintiff's theory is that as there were several specifications of negligence and only a gen-

eral demurrer, with no instructions calling for the elim-
ination of unproved grounds of recovery, the refusal of
the demurrer must be upheld.   [Crone v. United Rys.
Co., 236 S. W. 654, 656.]   But as we have said heretofore,
there was but one efficient negligent act charged, that of
leaving the doors open and the shaft unguarded.   De-
fendant's general demurrer, therefore, fully met plain-
tiff's case.   After this demurrer was overruled, the de-
fendant had a right to fight on as best it could, and did
not admit, by merely asking and having the court to give
its instructions 1 and 3, that there was sufficient evidence
to take the case to the jury.

Over the objections of defendant, the court gave, in
plaintiff's behalf, the following instruction on the pre-
sumption of due care on the part of deceased, *after* he
went into the building:

"The plaintiff's husband being dead and his tes-
timony not capable of production here and as no eye-
witness has testified as to what plaintiff's husband did
after he entered the building, the law presumes that he
exercised for his own safety such care as would be exer-
cised by an ordinarily careful and prudent person un-
der the same or similar circumstances and that he did
only such things as an ordinarily careful and prudent
person would have done under the same or similar cir-
cumstances, and it is your duty to find that he did exer-
cise such care unless you find from the greater weight of
the evidence that he did not."

The question is, does not this instruction ignore the
evidence of Katz's announced purpose in going into the
building, namely, "It will be too long to wait for him
(Storms), I will go and look for him."   Might not the
jury think, or at least have a right to think, that the fact
that Katz was not willing to do as ordinarily was done,
see Storms and get him to take them to the proper storage
place, but was going on his own hook into this dimly
lighted building as it is claimed, with the intention of
hunting Storms and getting action at once, was some in-

dication of hurry on his part or of an intention to use the elevator himself, and therefore *some* evidence of negligence on his part? The usual course pursued by Katz and Dolgenow was to go to the office and get Storms and have him take them about the building. But this time Katz is not willing to wait for Storms but announces his purpose to go hunt him up. Very slight circumstances may overcome the presumption of freedom from negligence. [Buesching v. St. Louis Gas Light Co., 73 Mo. 219, 233.] And presumptions have no place in the presence of actual facts disclosed to the jury. [Mockowik v. Kansas City, etc., R. Co., 196 Mo. 550, 571.] And while there are no facts disclosed after Katz got into the building, still does not the instruction ignore the fact of his expressed unwillingness to wait and of his intention of going to hunt for Storms? If it does, the instruction takes away from the jury the right to weigh such unwillingness to wait and expressed intention along with any other facts in passing on whether he was negligent or not. It tells the jury without qualification that the law presumes he exercised the care for his own safety as would be exercised by an ordinarily careful and prudent person. It is true the words "after he entered the building" are in the instruction and the instruction winds up with the clause "unless you find from the greater weight of the evidence that he did not." But the first quoted words have reference only to the fact that no eyewitness testified to what he did after he entered the building while the latter quoted words would be understood by the jury as meaning unless they found, from what happened after he went in, that he did not exercise care.

It is a grave question whether, under the circumstances of his unwillingness to wait and of his announced intention, plaintiff was entitled to any instruction on the presumption of due care, and certainly one should not be given which left out of view or ignored these important matters. As it is not necessary to a disposition of

the case at this time, we will not say that no instruction on presumption of due care should have been given.

Defendant insists that the case is one which calls for a reversal without remanding. We are not convinced of this, however, though we do not wish to be understood as suggesting a way in which to present a submissible case. All we mean is that under the circumstances, the case is one for remanding in order that, if sufficient evidence be available, plaintiff may present her case for the loss of her husband.

The judgment is reversed and the cause is remanded. All concur.