ETHEL KATZ, RESPONDENT, v. NORTH KANSAS CITY DEVELOPMENT CO., APPELLANT.*

Kansas City Court of Appeals.   March 4, 1929.

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, section 2708, p. 764, n. 80; section 3013, p. 1029, n. 30; section 3202, p. 1173, n. 70; Customs and Usages, 17CJ, section 10, p. 452, n. 48; section 15, p. 454, n. 63; section 18, p. 459, n. 97; Death, 17CJ, section 161, p. 1301, n. 36; section 183, p. 1316, n. 80; section 226, p. 1343, n. 70; Negligence, 45CJ, section 290, p. 867, n. 60; section 835, p. 1272, n. 66; section 895, p. 1330, n. 5, 6; Trial, 38Cyc, p. 1520, n. 75; p. 1756, n. 1.

*Cyrus Crane, Kenneth Mc. DeWeese* and *Richard S. Righter* for appellant.

*Trusty & Pugh* for respondent.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $5500 and defendant has appealed. This is the second appeal in the case. [See Katz v. North Kansas City Devl. Co., 258 S. W. 752.]

Additional facts were proved by plaintiff at the latter trial. At this trial plaintiff put upon the stand none of the witnesses who testified for her in the former trial but the testimony of her witnesses taken at the former trial was introduced in evidence by the defendant. At this trial plaintiff introduced the depositions of witnesses Fleck and Murphy on the question of liability. Defendant then introduced the testimony of witnesses Deines, Jackson and Dolgenow, taken at the former trial. At this trial the case was submitted to the jury by the plaintiff upon the theory that a custom or practise was

permitted by the defendant in its warehouse whereby the elevator was allowed to be away from the first floor with the doors open.

On this question plaintiff's witness, Fleck testified that he was employed by the Missouri Can Company; that this company stored cans in the building in question; that he had been working around the warehouse off and on for a year and a half before Katz was killed; that sometimes he would be there every day and other times only three or four days in every week; that he was there about one-third of the time; that on the day Katz fell into the elevator shaft and shortly prior thereto he was on the dock outside of the building south of the south door of the warehouse on the west side of the building and there saw Katz, who asked him "where Mr. Storms was;" that the witness replied that he did not know, but "supposed" Storms was upstairs. The witness then went into the building and to a drinking fountain therein located near the southwest corner of the freight elevator. Shortly thereafter Katz came in through the driveway. The witness was then taking a drink and Katz asked him how he, Katz, could "get up to the third floor." The witness told Katz, "go right over there and take the stairway" (pointing in the direction of the stairway at the corner of the passenger elevator). Immediately after he gave Katz these directions the witness stooped over to get another drink, and saw him take the first two steps. The witness was then twenty-five or thirty feet away from the elevator shaft. Shortly thereafter he looked up and observed a glimpse of both of Katz's legs from the knee to the foot, going down in the shaft, the rest of the body apparently being too far into the shaft to be seen. The witness testified that he did not see even this part of Katz's body clearly but "just an image of it;" that one of Katz's legs "was bent and the other just kind of leaving the floor;" that two or three seconds of time transpired from the time Katz made the last inquiry of him until the witness saw the image of Katz's legs going into the shaft. Katz hit the bottom of the shaft and the witness heard a groan. The witness testified at the time Katz fell the elevator was at the second or third floor.

The witness further testified that he had never seen Katz before; that the stairway could not be seen from where the witness stood; that it was necessary to go around by the passenger elevator in order to reach the stairway; that many people took this passageway by the passenger elevator to the office; that he did not see Katz from the time the latter took two steps from the drinking fountain until he saw Katz's legs as he was falling into the elevator shaft, so he did not see whether Katz opened the doors to the elevator. However, the witness testified that the doors were of corrugated metal and when they were opened they made "an awful racket;" that everything was quiet at the time Katz fell and that he heard no noise although

his hearing was good. From this testimony an inference arises that Katz did not open the doors to the shaft.

In reference to the practice mentioned in the former opinion of moving the elevator from floor to floor by pulling the rope in the shaft and leaving the doors to the shaft open, the witness testified that in order to get the elevator from floor to floor it was necessary merely to reach into the shaft and pull the cable or rope. There is some question as to whether the witness, in testifying as to the practice referred to, had in mind the freight elevator or the passenger elevator, but we think it fairly appears that the witness was referring to the shaft into which Katz fell or the elevator operated in that shaft. This appears to be made reasonably certain by the cross-examination of the witness during which considerable of his testimony on direct examination was gone over in connection with which he was asked in reference to the passenger elevator.

The witness testified on direct examination that he had seen persons reach in the shaft and pull the cable to bring the elevator to the floor upon which the person pulling the cable was located; that he had seen this done many times; that the elevator was operated in this manner more times than not; that he had ''seen Storms and several of them other fellows there do it;'' that he had seen one Murphy, who was an employee of the defendant, operate the elevator in this way; that he had seen Storms do it many times; that he had seen Storms take the elevator up from the first floor and had seen him stand on the first floor and bring it down from the top floor; that he had seen the doors standing open at various floors; ''about as many times as I have closed;'' that ''the most of the times'' he had observed the doors at the first floor open; that he had sometimes seen the doors closed during the daytime; that they would be closed up at quitting time; that when the elevator would be moved upward from a floor the doors were left open ''most of the times;'' that he had observed the elevator moving away from the floor where it was without anyone on it ''many times;'' that this had been done all of the time that he was there; that he had seen Murphy moving the elevator from floor to floor ''many times'' and that he had also seen one Boyd use the elevator, ''the same way that Storms used it.'' The evidence shows that Boyd was employed by the Missouri Can Company and was about the warehouse considerable of the time on the second floor and in the office on the first floor, but that he was in the office most of the time. The witness further testified that Storms was present when others used the elevator in the manner indicated; that he had seen Storms on the first floor and on the second floor when others had operated the elevator in such manner; that he had never heard Storms forbid anyone to so use the elevator, but that Storms said nothing.

On cross-examination the witness testified that the stairway from the first floor to the third floor was not locked; that the witness did not use the passenger elevator in going up and down but used the stairs. He further testified that he had seen the doors in an opened condition only of a morning; that he had not seen Storms take customers up on the passenger elevator "so very many times;" that he was not around when the doors were closed and did not know how they were opened under those circumstances; that the only times that he saw the elevator moved by one reaching in and pulling down on the rope was when the doors were open. He further testified that he had seen storms and Murphy use the elevator but had never seen Boyd use it; that when persons would come in with automobiles or other merchandise to be stored "if Storms was on the first floor he would take them up, if he was not, that other fellow in the office (apparently meaning Murphy), all the time, he would take them up, if they did not they had to stand there and wait for the big freight elevator. Q. If those men were not available, why, they waited until their turn? A. Yes, sir; the big freight elevator."

On re-direct examination the witness testified that he did not see the doors open every morning, but only some mornings; that he did not stay on the first floor of the warehouse all of the time and was not there every time a man was taken up in the elevator, because part of the time he was on the second floor and part of the time out in the car from which cans were being removed; that he was also working in another nearby warehouse. For these reasons he was only on the first floor occasionally. However, we take it from the testimony that the procedure that he testified to was followed when he was there, although he was not there all of the time. He testified that he had observed that the practice, in pulling the rope to bring the elevator to a certain floor, was carried on in reference to the second and third floors as well as the first.

Murphy, in his deposition, testified that he was employed by the defendant at the time his deposition was taken and at the time Katz was injured; that the elevator was operated by Storms and Mason. Mason, the evidence shows, was the manager of the warehouse and Storms the warehouseman who had charge of the warehouse, the storing and removing of the goods and caring for customers. Murphy testified that "when you left the elevator and closed the doors they closed up, then you would have to put a wrench or some kind of a tool in them to pry them open" "from the outside;" that the witness seldom used the elevator; that the doors to the elevator were never closed when the elevator was on the first floor; that they made "quite a bit of noise" when they were opened; that the noise could be heard in the office if there were no truck or other noise being made; that if a man desired to use the elevator and he were on the second or

third floor and the elevator were upon the first he would have to pry the doors open by using such an instrument as a screw-driver, chisel or pinch-bar if they were closed, if not he could reach in and pull the rope and move the elevator in this manner; that the doors did not work automatically but by hand. He further testified that it was the rule of the building that the doors at a given floor should be closed when the elevator was not there; that this was told Storms by Mr. Mason, the manager of the warehouse; that Storms did not tell the witness anything about closing the doors but he understood that to be the rule; that the witness was in the office when Katz fell through the shaft; that people bringing merchandise for storage would not go up the stairway but Storms would take them up in the elevator; that if Storms were upstairs "they would wait until their turn for the elevator;" that Storms would take them up in turn; that Boyd worked on the second floor; that he had never heard anyone give Boyd any orders not to use the elevator; that it was the general understanding that Boyd was not to use it; that Katz had been coming to the warehouse two or three years, sometimes "every day or two and sometimes not for a month;" that the witness had worked in the building three or four years; but that he had not before used the stairway when he worked for the defendant but had used it when he was in the army and was stationed at the warehouse.

The evidence of the witness Deines shows that he had used the stairway many times when he was with Storms and when he was not with him; that he did not use the passenger elevator when he was not with Storms; that he had seen "different fellows over there" use it when Storms was not present; that the way in which Storms operated the doors of the elevator when the witness was present was that when the doors were opened Storms would pull the rope and bring the elevator down and when they were closed he had to open the doors first and then move the elevator by the same method; that he (Storms) would "holler for it once of twice and if nobody answered he would jerk the rope;" that sometimes the doors on the first floor would be open and sometimes they would be closed "and a lot of times there would be a space between them of one or two feet;" that he had not been on the first floor with Storms when the doors were opened and the elevator was not there except on the day Katz fell into the shaft; that on this day the doors were open when the witness "got there;" that he had been with Storms on the third floor when the latter pulled the rope to bring the elevator to him and on those occasions no one was sent to the first floor to see whether the doors were open or closed; that this had happened a few times; that on the day in question when they went to get on the elevator at the first floor the elevator was not there but the doors were open; that Storms pulled the rope and brought it down; that when he, Storms and Jack-

son went to the third floor on that day they left the elevator doors open on that floor; that he had seen people when they could not get in touch with Storms use the elevator themselves; that these were men who were putting in or taking out merchandise.

We do not construe the testimony of Deines to mean that the doors were open only one or two feet when he, Jackson and Storms went to take the elevator to the third floor on the day in question. The witness seems to distinguish between there being a space between the doors of one or two feet and the doors being open and while he detailed what steps were taken in going up to the third floor on the day in question he at no time said that the doors were pushed open for them to get into the elevator but twice said they were already open. He testified:

"Q. When you got to the passenger elevator do you remember whether the doors were open or closed? A. The doors were open.

"Q. Do you remember whether the elevator was there or not? A. The elevator was not there.

"Q. What did Mr. Storms do then? A. He pulled the rope and brought it down to the first floor.

"Q. When it got down to the first floor how did he stop it? A. He had to reach in and stop it.

"Q. While it was moving? A. While it was moving.

"Q. Then did you three men get on the elevator? A. Yes, sir; we all three got on."

The testimony of the witness Jackson shows that he had operated the elevator on several occasions and had seen other customers of the warehouse operate it and Storms did not say anything "to us about it. Storms would be in the office sometimes when I would ask for the elevator and it would not be there, and he would say 'we could get the elevator and we would do that.' 'I mean by the word 'we' whoever happened to be with me." On these occasions sometimes Storms would go and operate the elevator for them and sometimes he would not. He had seen Storms bring the elevator from floor to floor and on these occasions nothing was done "to see that the doors were closed on the floor from which the elevator was moved."

Dolgenow testified that neither he nor Katz ever rode in the elevator except when Storms was operating it; that during the two years that he went to the building Storms and Mason operated the elevator.

Storms was introduced as a witness on the part of the defendant. He testified that Boyd worked on the second floor but that he usually stayed in the office; that sometimes Boyd used the elevator and would operate it in the same manner as the witness by reaching in and pulling the rope; that the elevator doors were always open when the elevator was at the first floor. If Boyd was on the second floor and reached in and pulled the elevator up to him there would be nothing

to shut the doors on the first floor and they would remain open unless Boyd would close them. Boyd never left the doors open after pulling the elevator away, to the witness's knowledge, ''he would have got an awful raking if he ever done that.''

Storms further testified that when he would be on an upper floor and the elevator was on the first floor he would bring the elevator up by pulling the rope, but he would not leave the doors open; that he did not know of Boyd leaving the doors open; that no one was supposed to use the elevator except Mason, himself and Boyd; that the Missouri Can people and the Indiana Silo people ''were not supposed to use it;'' that sometimes they did use it but it was without authority from the witness; that he did not remember telling them not to use it but it was against the rules of the house; that when they used it they would reach in and pull the rope; that this was the ''only way to get it'' (the elevator).

He further testified that the doors when pulled together ''never rebound unless he pulled them together afterwards;'' that Boyd did not use the elevator many times, as he had very little business; that when Boyd operated the elevator he would pull it from floor to floor by use of the rope; that Boyd was probably in the office at the time Katz fell into the elevator shaft; that he did not remember seeing Katz before the day in question; that he had been at the warehouse about a year and a half; that the practice of pulling the elevator from floor to floor by means of the rope continued all the time the witness was employed by the defendant, but it was not the practice to pull it from floor to floor ''without paying any attention to the doors;'' that he did not move the elevator in this manner when the doors were open, ''I never took it away from a floor when the door was open;'' that the employees of the Missouri Can Company and the Indiana Silo Company would sometimes use the elevator but without the permission of the witness, ''if I didn't happen to be there they would go ahead and use it. Some of them adopted the rule if they wanted to operate the elevator I was to operate the elevator;'' that when he would be taking care of customers on an upper floor other people would be required to wait on the first floor until he could take them up; that ''that was the practice of the building'' and it was not the practice to allow anyone who desired it to use the elevator; that this was against the rules; that he did not remember telling anyone that it was against the rules for them to operate the elevator ''but they knew it, that they had no right to use it.'' The witness did not remember whether the doors were open on the first floor and the elevator above when he, Deines and Jackson started to the elevator to go to the third floor on the day in question.

It is insisted by the defendant that its demurrer to the evidence should have been sustained; that the evidence ''did not show a negli-

gent custom of leaving the elevator doors open on the first floor." It is true, as defendant insists, that there was no one who testified directly that the doors were habitually or customarily open when the elevator was not at a given floor. Defendant objected to the witness Fleck testifying that it was the practice to pull the elevator from floor to floor but this practice was amply established by the evidence. It is claimed by the defendant that at the most the testimony shows that sometimes the doors were open and sometimes they were closed when the elevator was not at the first floor, and that this did not establish the custom or practice relied upon.

The testimony of Fleck shows that when the elevator would be taken away from a given floor the doors would be left open "most of the time," that is to say, the doors would stand wide open; that this occurred all of the time that he was there. Of course, the witness was not there the greater part of the time, but there is nothing in the evidence to suggest that if this was the practice when he was there the practice would not be continued when he was not there. In other words it is reasonable to suppose that if the practice was in force at the times he was there it would continue to be when he was not there, unless there was a different way of transacting the business of the warehouse in connection with operating the elevator when he was not there. There is no evidence or suggestion in the evidence of any reason why there should be any change at anytime in the method of the operation of the elevator. Fleck was there off and on and when there the doors were left open in the manner indicated more often than otherwise. But the defendant insists that this manner of handling the elevator must have been general, uniform, certain and notorious in order to establish a negligent custom. It is true that some of the authorities have used similar language to this. [See Shields v. Ry. Co., 87 Mo. App. 637, 643, 644.] In the case of Pankey v. Ry. Co., 180 Mo. App. 185, 199, cited by the defendant, there was no custom or practice of any kind shown. The Shields case deals with a custom, use or practice in a particular line of business, that is, by others in the business as well as the defendant, and the custom was relied upon in that case in order to show that the defendant was negligent in not complying with it.

When it is required to show usage, custom or practice in a given line of business it is necessary for the purpose of bringing notice to an individual engaged in that business of the custom to show that _ is general, uniform and notorious. [17 C. J. 454, 455.]

In the case at bar we are dealing with a practice in a particular establishment and not a custom as that term is technically used. It has nothing to do with a custom or usage or even a practice of others in a like business or trade. It would certainly not be necessary to show general uniformity of the course of conduct under these circum-

stances in order to bring the practice home to the owner of the business, when it is being carried on before the very eyes of himself or his agents. In this case there was evidence tending to show that the practice was brought to the attention of Storms and that he said nothing but permitted it. The evidence having shown that the practice ,was brought to the attention of the defendant's agent, the question becomes one as to whether the practice was sufficiently general to have brought home to the defendant the likelihood of the negligent acts being committed in the future. If the practice was so general as to cause a reasonably prudent man, who had knowledge of it, to believe that the negligent act would likely occur at anytime, then the owner of the premises ought not to be heard to say that he was free from blame in not taking any steps to end the practice in his establishment.

We think that the testimony of Fleck by itself shows a sufficient negligent practice for the consideration of the jury, that is as to whether or not the defendant permitted a practice of leaving the passenger elevator doors open when the elevator was not present. Fleck's testimony was corroborated in many essential particulars by other testimony taken in its most favorable light to the plaintiff. Of course we are now considering the demurrer to the evidence and consequently we must take all the testimony in its most favorable light to the plaintiff, and if there is any conflict in the testimony *even in that of plaintiff's own witnesses,* only that which is most favorable to the plaintiff should be considered by us. [Frankel v. Hudson, 271 Mo. 495.]

The witnesses Murphy and Storms testified that when the elevator was at the first floor the doors were always open. There was evidence that it was the common practice when a man was on one of the upper floors (this does not necessarily mean Storms or an employee of the warehouse, as there was evidence that others were permitted to follow the practice), the elevator would be removed from the first floor to the upper floor, where it was desired to bring it, by the party usir the rope. On this question the testimony of Deines that Storms would "holler for it (the elevator), once or twice and if nobody answered (that is was using it), he would jerk the rope," is significant. It is true that Storms testified that the elevator was not removed when the doors were open. If the jury believed Storms then it would naturally follow that the elevator was never thus (that is by reaching into the elevator shaft and pulling the rope) taken from the first floor for the reason that the doors were always open on that floor, and there is no evidence that the party operating the elevator would go to that floor and close the doors, but the evidence is to the contrary. There is ample evidence that the elevator was "pulled" away

from the first floor, leaving the doors open there, and the jury was at liberty to disregard Storm's testimony in this connection.

Aside from the positive testimony that the elevator would be taken away from the first floor without the doors being closed, a practice, such as is shown in the testimony, of taking the elevator away from the first floor by someone above when the doors on the first floor were always open, would naturally and almost inevitably result in the doors of the first floor being left open with the elevator somewhere else. There was evidence that it required a tool to open the doors from the outside when they were closed. This may account for the practice of leaving the doors open. We have no doubt whatever that there was sufficient evidence to go to the jury for their consideration as to whether or not a negligent practice was shown in this case. In this connection it is worthy of note that on the very day Katz fell, and shortly prior to his falling, when Storms, Deines and Jackson started to the third floor they found the doors open at the first floor with the elevator gone and when they went to the third floor they left the doors open and someone pulled the elevator away.

However, it is contended by the defendant that the uncontradicted evidence at this trial shows, as it did in the first, that when Storms, Deines and Jackson went to the third floor, about fifteen or twenty minutes before Katz fell, they closed the doors at the first floor; that the elevator after Katz fell was found at the second floor, and that in order to find that the doors on the first floor were left open, as the result of the negligent practice, if any, it is necessary to build inferences upon inferences, which is not allowed. In this connection defendant relies upon what was said by this court in the former appeal. In the opinion of this court at that time it was stated that the case was not pleaded or tried upon the theory of a negligent "custom," and that this court was not to be understood as suggesting a way in which a case might be made on a second trial. Therefore, it would appear that it was unnecessary for this court to have said anything in reference to what would be necessary to make a case under a theory of negligent "custom" or practice.

However, if the opinion in the former appeal is clearly understood we think it properly declares the law. In view of the facts disclosed in the evidence in the former trial and discussed in the opinion it appears that it was the view of the writer of that opinion that it would be necessary, even though a negligent "custom" be established, to show how the doors were opened prior to the time Katz fell. The reason for this statement becomes apparent when we reach that part of the opinion (l. c. 758) which states that in order to show negligence on the part of the defendant the presumption of due care on the part of Katz could not be relied upon. At this point, quoting from Menteer v. Fruit Co., 240 Mo. 177, 186, this court said: the presump-

tion of due care on the part of a decedent, "is not a presumption of defendant's negligence but one of deceased's freedom from contributory negligence. It does not relieve plaintiff from the burden of proving defendant's negligence. One presumption cannot be based upon another." In the former appeal there was no evidence tending to show that Katz himself did not open the doors. So even though a negligent practice were established it would be merely a matter of guess or speculation, under the facts then shown, as to whether he, or someone else for whom defendant would be responsible, by reason of agency or the practice, opened them. Under the facts considered by this court in the former appeal it was therefore necessary not only to show the practice but that someone other than Katz opened the doors, and the only way in which that could have been established was to show how they were actually opened. In the former trial in attempting to do this plaintiff failed, because there was only one way suggested by plaintiff or this court by which the doors could have been opened by someone for whom the defendant would be responsible and in order to arrive at any conclusion on this matter it was necessary to build inferences upon inferences which is not permitted. The opinion held that in the absence of any "custom" it would be necessary to show that some agent of the defendant left the door open; that plaintiff wholly failed to so show, and that if plaintiff expected to rely upon the conduct of some other person, other than the agent of the defendant, in fixing liability upon the defendant, it would be necessary to show the negligent "custom" referred to in the opinion. In other words the "custom" could be shown to take place of the showing of agency, but even after such "custom" were established it would be necessary to show that someone governed by the "custom," other than Katz himself, opened the doors, for if Katz opened them defendant would not be liable.

At the trial that we are now reviewing it was not necessary to show who left the doors open for the reason that there was evidence tending to show that Katz did not do it. There is no suggestion that the doors were left open by someone who was not desirous of using the elevator, at least it may be inferred that they were left open by someone using the elevator, as it is not reasonable to suppose that they would have been opened for any other purpose. The elevator doors being found open and they not having been opened by Katz himself, their condition of openness may be referable to the negligent practice of pulling the elevator away from a floor with the doors open at that floor, and the jury had a perfect right to refer that condition to such a practice as the most reasonable explanation of their condition. Therefore, it was unnecessary, in view of the fact that Katz did not open the doors, to introduce any evidence tending to show the manner in which they were opened.

The undisputed testimony shows that the doors were closed when Deines, Jackson and Storms went to the third floor of the building. We need not pass upon the question as to whether or not the jury were bound to find that these parties closed the doors, for the reason that even if they did so close them, the jury were at liberty to find that they were afterwards, and before Katz fell into the shaft, opened by someone other than Katz. Fifteen or twenty minutes transpired from the time these men went to the third floor until Katz fell. As before stated it was unnecessary to show the process that was gone through with when the doors were opened, or in what connection they were opened. Assuming, but not deciding, that plaintiff was bound by the testimony of Deines and Jackson in reference to the closing of the doors when they went with Storms to the third floor, taken at the former trial, as an admission against interest on the ground that she vouched for their credibility at that trial, and that their testimony shows that they closed the doors, and there is no testimony showing who opened them except that Katz did not, still plaintiff was not required to show who opened the doors, but the jury were at liberty to find that their opened condition was referable to the negligent practice.

Even though there were, in fact, an inconsistency between the testimony of Deines and Jackson in stating that they closed the doors and the testimony of Fleck tending to show that Katz did not open them, yet there was no duty upon the plaintiff to explain the testimony of these men whose credibility she vouched for at the former trial. Even if plaintiff herself had testified in the former trial, as did these men, and for that reason her testimony could have been used at this trial as an admission on her part, yet she would not have been conclusively bound by such an admission. [Steele v. K. C. Ry. Co., 302 Mo. 207; Securities Co. v. St. Louis Co., 261 S. W. 87; Schroeder v. Wells, 298 S. W. 806, 810; Guilvezan v. Union of Roumanian B. & C., 287 S. W. 787; Davidson v. Frisco Ry., 301 Mo. 79, 86.]

What was said by this court in the case of Dempsey v. City Light & Traction Co., 256 S. W. 155, 157, was founded upon our construction of the opinion in the first appeal in the Steele case. [See Steele v. Railroad, 265 Mo. 97.] However, the Supreme Court in the second appeal of the Steele case (302 Mo. 207) and subsequent cases has explained the holding in the first Steele appeal to be contrary to our understanding of it as disclosed in the Dempsey case. For instance, in the case of Davidson v. Frisco Railroad, supra, l. c. 86, the Supreme Court said:

"The contradictory statements in Steele's case occurred in the same trial and hearing. Such statements stood as admissions in a

case then being heard. It amounted to contradictory admissions at the single trial. In this, it is to be distinguished from the present case. The general rule is that where a plaintiff at one hearing testifies in a given way, and at a later hearing testifies to the opposite, it is for the jury to determine what credence it will give to the evidence given before them, as impeached by what such party said at the previous hearing.''

Even if the testimony of Deines and Jackson at the first trial can be construed as inconsistent with that of Fleck's at the second trial, we believe that there was no necessity of any explanation at the last trial of Deines' and Jackson's testimony at the first trial. We can see a difference between the testimony, taken at a former trial and uncontradicted at the present trial, of a party and such testimony of a witness or witnesses of a party.

It is claimed that the physical facts as testified to by plaintiff's witnesses show that the light was sufficient. This contention is not based upon any claim that the light was perfect, but it is claimed it was sufficient in view of the fact that it was light enough for Fleck to see Katz's legs going down into the shaft twenty-five or thirty feet away, and if it was light enough for this it was light enough for Katz to see that the shaft was there. There is ample testimony tending to show the absence of sufficient light under the circumstances, other than that of the testimony of Fleck, and if there is any inconsistency in the testimony of plaintiff's own witnesses, the jury were authorized to believe the ones who testified most favorable to the plaintiff. [See Frankel v. Hudson, supra.] There was testimony tending to show that the sides of the elevator shaft and the doors and the bottom of the elevator itself were of a dark color; that there was no artificial light and that when the elevator was above the first floor there was no light shed upon the place where Katz fell from or above the elevator; that the doors on the east side of the warehouse were closed and that the light coming from the east windows was materially obstructed by the presence of box cars on the outside and merchandise piled on the inside of the warehouse.

The witness Deines testified that it was dark around the elevator shaft and that when he, Storms and Jackson got into the elevator "there was little light," "dim light;" that the windows on the east side did not "let much light through them;" that he was out in front of the elevator after the accident happened and that "he couldn't call it light in there." Jackson testified that the day in question was dark and cloudy and one near the elevator shaft on the first floor could not see clearly where he was walking had he not been acquainted with the building. His attention was called to his testimony at the Coroner's inquest where he said *he* could see where *he* was going but

he explained, that one could see a large sized object like a large box or automobile and that "if it was something you really needed to look carefully for you couldn't see it." Of course the evidence of darkness detailed in the opinion in the former appeal was again introduced at the present trial.

We are not prepared to say, even if Fleck's testimony that he saw the deceased's legs twenty-five or thirty feet away were taken as true, there was sufficient light in view of the fact that Fleck did not say he saw deceased's legs plainly, but merely an outline or image of them. It is one thing to see an object between or in the light, even though the light be dim, and seeing a dark hole in a floor. The evidence shows that there was no light whatever in the basement and we take it that it was almost if not pitch dark therein. It is contended that Katz was a bare licensee and not an invitee, but we think it is quite apparent that there is no merit in this contention.

It is next contended that Katz was guilty of contributory negligence as a matter of law. This point was made in the former appeal and ruled against the defendant in the following language (l. c. 759). "Defendant insists that the case is one which calls for reversal without remanding. We are not convinced of this . . ." However, in this connection defendant again argues that there was sufficient light for Katz to have seen, especially in view of the fact, as defendant claims, Katz was familiar with the premises. We think there is conflict in the testimony as to his familiarity therewith. While Dolgenow testified that he and Katz had been going there for two years "sometimes two or three times a week and sometimes once a month," and Murphy gave similar testimony. Storms, the man in charge of the warehouse testified that he had never before seen Katz. Fleck testified likewise, and that Katz asked the way upstairs. From the testimony of Storms and Fleck the jury could infer that Katz was not familiar with the premises and had not been there as much as the evidence of Dolgenow and Murphy tends to show. Returning again to the condition of light the evidence is such as to lead us to believe that it was similar to that present and under consideration in the case of Aiken v. Sidney Steel Co., 198 S. W. 1139, 1140, where the court said:

"It was not the light of broad day light so that one could be charged with listlessly and blindly blundering into an elevator shaft; nor was it so dark that one could know, or realize, that he could not see. But it was in that indefinable state between full light and complete darkness which permits one to see imperfectly, and frequently deceptively, as in twilight. Plaintiff's case meets that situation."

We have examined the cases cited by the defendant but find them dealing with different conditions than those disclosed in this case.

Complaint is made of the giving of plaintiff's instruction No. I, but the defendant admits that if the demurrer to the evidence was properly ruled there is no merit in its contention. This point, therefore, will be ruled against the defendant.

It is claimed that the court erred in giving plaintiff's instruction No. 3, which reads as follows:

"The court instructs the jury that the remarriage of a widow does not preclude her right to recover for damages on account of the death of her first husband, nor reduce the amount of damages, if any, to which she would be entitled had she not remarried. And therefore in this case, if from the evidence you find that the plaintiff was the wife of Samuel Katz at the time of his death, then the fact of her subsequent remarriage does not prevent her from recovering damages on account of his death, nor does such remarriage affect the amount which she would otherwise be entitled to recover, if any."

In this connection it is claimed that there is no evidence from which the jury could find that plaintiff was the wife of Samuel Katz at the time of his death, in other words that the evidence fails to show that she is the widow of Katz. Plaintiff did not testify and there is no direct testimony to the effect that she is Katz's widow. However, it was unnecessary for plaintiff to make proof of this fact for the reason that section 4218, Revised Statutes 1919, under which she sues, does not provide for an original cause of action created by the death of the husband but the suit is founded upon a right which the deceased might have exercised had he survived, which is transmitted to his representative. [Proctor v. H. & St. J. R. R. Co., 64 Mo. 112; White v. Maxcy, 64 Mo. 552.] It is well settled that the general issue or general denial admits plaintiff's authority in the capacity and character in which she sues. [31 Cyc. 207.] Plaintiff sues in her capacity as widow of the deceased and the answer fails to make any issue of the matter. We might say however that we think the answer, where it pleads contributory negligence, affirmatively admits that she is the widow of the deceased.

It is claimed that the instruction is erroneous in that it assumes as a fact that plaintiff was subsequently remarried, and that there was error in telling the jury that the remarriage did not affect the amount which otherwise she would be entitled to recover. In 13 Cyc. 365, it is said:

"In an action by a husband for the death of his wife, or by a widow for the death of her husband, the subsequent marriage of the survivor is not to be considered in mitigation of the damages sought to be recovered; nor the fact that the husband and wife were living in a state of separation at the time of the death of the spouse."

In 5 Sutherland on Damages (4 Ed.), page 4884, it is said: "The widow's remarriage will not preclude her from maintaining the action nor affect the amount she is entitled to recover." [See, also, Davis v. Springfield Hospital, 218 S. W. 686, 700.] Therefore, we think there is no merit in defendant's contention. As plaintiff's remarriage does not affect the amount of her recovery it would seem to be immaterial whether there was any showing that she subsequently remarried. However, the record discloses that the question of plaintiff's remarriage was not a contested matter. [See Davidson v. Transit Co., 211 Mo. 320, 356, 361.] Defendant claims that plaintiff's daughter testified that she was not able to tell whether her mother married Mr. Witte. But as we read the record she was unable to give the date of the marriage rather than stating that she was unable to say whether her mother was married to Witte. In defendant's instruction E it tells the jury that plaintiff's name is now "Ethel Witte."

It is insisted that the court erred in giving plaintiff's instruction No. 4. This instruction is on the measure of damages. It is general in its scope. It is claimed that the instruction is erroneous because "there is not a scintilla of testimony in the record showing the amount of deceased's earnings, the amount he contributed to his family's support, or the amount of the increased pecuniary burden cast upon the alleged widow." The instruction does not refer to any of these things and if it was too general defendant was at liberty to offer an instruction limiting the amount of recovery. [Smith v. Mederocke, 259 S. W. 83.] Plaintiff made a sufficient showing upon which to base the instruction. Deceased's daughter testified that her father was in the garage business at the time of his death; that she had a brother by the name of Henry Katz; that deceased contributed to the support of her mother and the children "very much so;" that he was kind and affectionate towards his family; that "we were not wealthy but he provided enough to make us happy;" that her father was a hard working industrious man of good health; that her mother was about thirty-four years of age at the time of his death. We think there was no error in the instruction. [Haines v. Pearson, 107 Mo. App. 481; Smith v. Simpson, 288 S. W. 69, 73.]

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.