**Harold HOWARD, Appellant,**

v.

**Lloyd WINEBRENNER, Respondent.**

No. 56927.

Supreme Court of Missouri, Division No. 1.

Sept. 10, 1973.

Rehearing Denied Oct. 8, 1973.

Albert J. Yonke, Kansas City, for appellant.

Warren D. Welliver and William A. Atkinson, Welliver, Beckett & Simon, Columbia, for respondent.

HIGGINS, Commissioner.

Appeal (taken prior to January 1, 1972) from order overruling plaintiff's motion for summary judgment, sustaining defendant's motion for summary judgment, and dismissing plaintiff's petition for $75,000 damages for personal injuries.

Plaintiff alleged: that defendant is the owner and operator of certain tractors and trailers and is in the business of hauling as a contract and common carrier; that on June 4, 1967, plaintiff was walking in an easterly direction in defendant's lot, when and where defendant, who was backing a tractor and trailer in an easterly direction, negligently caused and permitted the tractor-trailer to come into collision with plaintiff and, as a direct result, he suffered serious and permanent injuries.

Defendant, by alternate motion to dismiss or for summary judgment, alleged: that at the time of plaintiff's injury, plaintiff and defendant were subject to and operating under the Missouri Workmen's Compensation Law, Sections 287.010 to 287.800, RSMo 1969, V.A.M.S.; that at the time of his injuries, plaintiff was an employee of defendant and his injuries arose out of and in the course of his employment by defendant; that following the injury, defendant and his insurer became liable for and have paid compensation and medical benefits to plaintiff.

Plaintiff also moved for summary judgment, limited to the issue of the defense that plaintiff was an employee of defend-

ant with his exclusive remedy in the Workmen's Compensation Act.

Both motions were submitted to the court, together with supporting affidavits, exhibits, and depositions of plaintiff, defendant, and Robert D. Scherff.

The decisive question is whether an employee-employer relationship existed between plaintiff and defendant at the time of plaintiff's injury. Plaintiff states: " * * * there is little dispute on the facts and the parties agreed that * * * whether * * * plaintiff's action is barred by reason of plaintiff's coming under the Workmen's Compensation Law may be decided on the facts contained in the depositions, affidavits and exhibits."

The undisputed facts as plaintiff states them follow:

"Plaintiff worked for the defendant in 1961 for about a year and for about six months after he got out of the army in 1964. After that he owned a tavern, worked at Ralston-Purina for over a year and drove a cement truck on construction in Kansas City. He drifted around some but did not go back to work for the defendant. In June, 1967 when he was injured he was waiting for a call to go to work on construction in Kansas City. Whenever defendant would call him and he felt like it and was available he would take an occasional trip for the defendant. When he drove, plaintiff drew 20% and defendant drew 80% of what defendant was paid or what defendant received. Between January and July, 1967 plaintiff made two to four trips for defendant to St. Louis and Kansas City.

"On Sunday afternoon [June 2, 1967] defendant called plaintiff and asked if he wanted to pull a load of livestock to St. Louis Monday night; plaintiff agreed to do so. The usual rate of compensation was to apply. * * * Plaintiff did not take the trip to St. Louis as defendant had asked him to because defendant had received a call from Scherff Truck Lines

and defendant gave plaintiff the choice of taking the trip for him (defendant) or for Scherff. This choice was given plaintiff when he came to defendant's lot to haul the cattle about 5:00 p. m. Monday. * * * Plaintiff parked his car on the east side of the lot facing in to the fence. * * * Plaintiff had run a few trips for Scherff in 1959 and 1960, the last one being in 1960. He had not worked for Scherff from 1960 to 1967. Plaintiff told defendant he would run for Scherff because it was cleaner. He was supposed to pull a trailer to Kansas City and back for Scherff. There was no discussion between plaintiff and defendant about how he would be paid but plaintiff figured Scherff would pay him because that is the way they paid the leased drivers. There was no definite time set for him to leave but it was to be Monday afternoon, and he was to be hauling freight. There was no conversation with defendant about the trip and defendant was to take the trip to St. Louis with the livestock. Plaintiff drove the twin screw tractor. The conversation with defendant lasted five to ten minutes and then plaintiff went to Scherff's home office in California, Missouri in defendant's tractor.

"When he got to Scherff's he put a bunch of lease signs on the truck [tractor] which he got from Bob Scherff. He then hooked on to an empty trailer, pulled it to Sedalia, dropped it, picked up another one and went to Kansas City. He left the trailer at Scherff's dock and picked up a loaded trailer and pulled it back to Sedalia. He had been given a list at Scherff's home office with the trailers he was to haul. In Sedalia he dropped the trailer, hooked on to another Scherff trailer, pulled it to Scherff's Kansas City dock, picked up another trailer and pulled it back to California, Missouri. When he arrived at Scherff's lot in California about 7:00 a. m. he went to the dock to see where they (Scherff) wanted the tractor [trailer] dropped. He was told to back it up to the dock; he unhooked it and they (Scherff's

employees) told him to take the tractor back to defendant in Clarksburg. He then took the tractor to defendant's place; when he got there he spoke a few words to defendant in front of the gas pumps, crawled out of the truck after gathering up his clothes and papers, went around in front of the truck, down the right side of the truck and headed for his car. The truck was parked headed west by the gas pumps. Plaintiff was walking east, heard the truck start up and was struck by it. While defendant gassed the truck two of them talked. Defendant asked him if anything was wrong with the truck. Plaintiff did not have anything to do with gassing the truck and when he got out he said he was going home and went around in front of the truck. Plaintiff was first struck in the foot and then knocked face down in the dirt and run over by the tractor, which defendant was personally operating.

"About ten minutes elapsed from the time plaintiff pulled up to defendant's station and the time the accident happened. During this time they were discussing the mechanical devices on the truck and that it was ready to go on a run. Defendant states that they also discussed another trip being available. The motor was not running and plaintiff left the keys in the engine.

"Plaintiff has not worked for defendant since that time. He was paid by defendant 20–80 for that particular trip. He was not paid anything by Scherff. This was the only time he had pulled anyone else's trailer with defendant's tractor. If he had been working for defendant he would have gassed the truck himself.

"Scherff gave plaintiff his orders, told him which way to go, and not to drive over ten hours. He had no instructions from defendant not to drive over ten hours. Scherff told him to drive carefully, within the speed limit and not to tear up the truck. Scherff told him to go to Kansas City after putting signs with Scherff's name on the truck [tractor] which he did.

In case of a breakdown plaintiff would have called Scherff. Before he left defendant's place, defendant gave him no instructions at all on what route to follow. Defendant did not tell plaintiff which route to drive; defendant furnished the fuel. According to defendant, in case of an accident plaintiff would have called Scherff and defendant; but only defendant in case of a breakdown. Defendant did not tell plaintiff what time to be back. It is Scherff's decision what to do with the tractor [trailer] and all Scherff did was lease defendant's tractor and pay so much a mile. Scherff had the right to turn down a driver. Plaintiff would have had to pay his own meals because he was on a straight percentage. Defendant paid bridge tolls. Scherff's sign covered defendant's name on the doors. It is customary for the drivers to follow Scherff's instructions. Plaintiff was not obliged to take either job and defendant just asked him. If a driver got drunk it would be up to Scherff to order him out of the truck although if defendant caught him he would do so himself.

"Plaintiff filed no Workmen's Compensation claim as a result of the accident. His medical expenses were paid and he drew some weekly checks but the checks did not state what they were for. He received no forms or communication from the Division of Workmen's Compensation.

"On some occasions when plaintiff drove defendant's trucks he was paid in cash. The only way he was ever paid by defendant was on a 20–80 basis. Defendant offered him a regular job on the night he left for Scherff's at a salary of $100.00 per week but plaintiff refused the job because he was going to work on construction. Defendant remembers making such an offer but it may have been the next morning. Plaintiff knows of some truck leases that lease the truck without the driver and he has no knowledge of the lease agreement with Scherff. Plaintiff assumed that Scherff would pay him. On this particular trip he does not recall getting a W–2 form

from defendant but he did get one at the end of the year. He did not get a W–2 form from Scherff.

"Defendant is a livestock dealer and trucker. In 1967 he operated two tractors and three trailers but did not have a P.S.C. permit. On June 5–6, 1967 he had two full-time employees who worked forty hours a week—one on a weekly salary and one on a 20% of gross revenue. Defendant does not have the particular lease agreement that should have been signed here but has a form like it.

"* * * Plaintiff had worked for Scherff in the past but not immediately prior to or subsequent to the date in question. Scherff had a trip lease agreement with defendant which was not retained by him. He identified a form which would have been used for the trip in question. He does not, however, specifically remember the lease agreement being signed by him. He was not present when plaintiff returned the truck to Scherff's premises. Plaintiff would have been required to call Scherff if there were mechanical difficulties with the truck or if he had an accident. Plaintiff had certain routes he was to take in driving for Scherff and those were the only routes that he was allowed to take. New drivers are given particular instructions as to speed, basic routes, where the weight stations are located, where to place the placards on the truck, how to fill out a log and things of this nature. These instructions are given the drivers on the first occasion but not thereafter. The drivers usually do not unload the trailers but if they did so they would be given particular instructions in that regard. These instructions would be given to drivers of leased trucks and would be fairly specific. Scherff had the right to refuse a driver sent by defendant. The lease provides that the lessee shall pay the driver but this is not generally done and plaintiff was not paid by Scherff. Defendant was paid on a mileage basis. The driver would be instructed not to drive over ten hours. If plaintiff had shown up drunk the foreman would have pulled him off the truck. When a driver is first sent to Scherff inquiries are made about his experience by Scherff. The mileage paid was from Scherff's dock and back to Scherff's dock.

"* * * plaintiff stated that he was directed by an employee of Scherff to return the truck to defendant's lot in Clarksburg; that when he arrived at defendant's lot he received no instructions concerning where to park the truck, what to do in regard to leaving the motor running or any other instructions; that when plaintiff left defendant's lot on June 3 he received no instructions from the defendant on the operation of the truck and no instructions as to whether or not to return it to defendant's lot; that in case of a breakdown, accident or injury plaintiff was instructed to call Scherff; that Scherff gave plaintiff detailed instructions as to routes to be driven, the speed and other traffic rules to be followed, the number of hours to be worked and the method of handling the cargo; that Scherff could refuse to accept him as a driver of said truck and could have discharged him for intoxication or other actions; that plaintiff could refuse to make this trip; that plaintiff did not work regularly for defendant; at the time of plaintiff's injury there was a Scherff Truck Lines sign on said truck; that plaintiff at no time consented or agreed to become an employee of defendant."

Defendant adds the undisputed facts that follow:

"The accident and resulting injuries which is the basis of plaintiff's claim for relief occurred on defendant's premises, when a tractor, owned and operated by defendant, backed over plaintiff. This tractor had shortly before been parked upon defendant's premises by plaintiff. Plaintiff had, prior to the accident, returned the tractor to defendant's premises after having pulled several trailers for Scherff Truck Lines in accordance with a trip lease between Scherff Truck Lines and defendant. * * *

"Plaintiff did not take the trip to St. Louis, referred to in plaintiff's statement of facts, which defendant had asked plaintiff to take on Sunday afternoon, because defendant had received a call from Scherff Truck Lines requesting a truck and a driver. A trip lease agreement was entered into between defendant and Scherff. When plaintiff arrived at defendant's place of business, defendant informed plaintiff that the defendant was going to lease a tractor to Scherff Truck Lines for a trip to Kansas City. Defendant gave plaintiff a choice as to which trip he would like to make. There was no discussion between plaintiff and defendant about how defendant would be paid, though plaintiff had never been paid on any other than a 20–80 basis by defendant. At any time when plaintiff had worked for or driven any trucks for defendant he had been paid by defendant. Plaintiff was paid by defendant for this particular trip on a 20–80 basis. There was no employment agreement between plaintiff and Scherff and there was no agreement between plaintiff and Scherff whereby Scherff would pay plaintiff for the trip.

"There was no discussion between plaintiff and defendant about what route plaintiff was to follow, what action plaintiff was to take in case of accident or theft or where plaintiff was to leave the tractor after pulling Scherff's tractor. Plaintiff had worked for defendant before and was familiar with the defendant's operative procedures. Plaintiff knew that upon completion of the run, he was to return the tractor to defendant's premises.

"If there had been a breakdown while in transit, defendant would have provided the sleeping space for plaintiff, if necessary. Defendant was obligated to maintain the tractor in good working condition, furnish all necessary repairs for the tractor, and pay expenses incidental to the operation of the tractor.

"Scherff had the right to refuse drivers sent over by defendant and if a driver were intoxicated, Scherff had the right to order him from the tractor. In either such case, Scherff would cancel the run the driver and tractor were to make. Scherff did not have the right to replace the driver sent by defendant without consulting defendant.

"Plaintiff's medical bills have been paid and plaintiff has received 71 weekly checks from Hartford Insurance Company."

Section 287.020(1) RSMo 1969, V.A.M. S., provides: "The word 'employee' * * * shall be construed to mean every person in the service of any employer * * * under any contract of hire, express or implied, oral or written, or under any appointment or election * * *." The Supreme Court, in construing this provision of the Act, "has given it a broad meaning, and has held that it should be so construed that any doubt presented in any case should be resolved in favor of the employee being covered by the act," citing Pruitt v. Harker, 328 Mo. 1200, 43 S.W.2d 769 (1931). Ellegood v. Brashear Freight Lines, Inc., 236 Mo.App. 971, 162 S.W.2d 628, 631 [3] (1942). See also Gass v. White Superior Bus Co., 395 S.W.2d 501, 503 (Mo.App.1965).

" * * * The framers of the act had in mind the law of master and servant and the relationship, duties, rights, and limitations arising out of the same. The relationship [of employee and employer] is bottomed upon services * * * to be rendered by the servant—whether by that name, or one synonymous, as workman or employee * * *—to the other, whether as master or employer, and is peculiarly characterized by right of control vested in the latter." Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S.W.2d 909, 912 [2] (1935). This test of existence of an employee-employer relationship was reviewed, and the conclusion drawn, Lawson v. Lawson, 415 S.W.2d 313, 319 [5] (Mo.App. 1967): " * * * that only two facts are necessary to an employer-employee relationship under the Compensation Law,

namely, 'one, that the claimant was in the service of the [alleged employer], and, two, that said services were controllable' by the latter." Saxton v. St. Louis Stair Co., 410 S.W.2d 369, 375 (Mo.App.1966). To these criteria should be added the definition of services as "performance of labor for the benefit of another." Langley v. Imperial Coal Co., 234 Mo.App. 1087, 138 S.W.2d 696, 698 [2] (1940).

The proof showed unassailably, Rule 74.-04(b), V.A.M.R., that plaintiff was performing labor for the benefit of defendant and that he was in the service of defendant. Defendant had a lease agreement with Scherff Truck Lines to supply Scherff with a tractor and driver to pull Scherff's trailers. Plaintiff, by choosing to drive defendant's tractor on Scherff's run was benefiting defendant because that service entitled defendant to the contract price for the lease run. This benefit continued through the time the tractor was returned by plaintiff to defendant's premises, the ensuing discussion between plaintiff and defendant with respect to performance of the tractor on the road, and plaintiff's departure from the premises. Thus was shown the rendition and acceptance of service between plaintiff-employee and defendant-employer. Maltz v. Jackoway-Katz Cap Co., supra; Lawson v. Lawson, supra.

■ With respect to control as a part of the test of existence of an employee-employer relationship, it is necessary to show that the employer had "the right to control the means and manner of the service, as distinguished from controlling the ultimate results of the service. Coy v. Sears, Roebuck & Co., 363 Mo. 810, 815–817, 253 S.W.2d 816, 818–819 [1]." Gass v. White Superior Bus Co., supra, 395 S.W.2d 1. c. 504 [1]. The right of control is affected by such things as extent of control, actual exercise of control, duration of employment, right to discharge, method of payment for services, furnishing of equipment, whether the work is part of the regular business of the employer, and the contract of employment, none of which is in itself controlling, but each may be considered relevant to the issue. Lawrence v. William Gebhardt, Jr. & Son, 311 S.W.2d 97, 102–103 [1] (Mo.App.1958).

Again, unassailably, the proof showed that defendant paid plaintiff for the trip in question as well as for all runs made with defendant's tractor prior to the trip in question. Defendant also withheld income taxes from plaintiff and provided him with W–2 forms for 1967. Plaintiff was not on Scherff's payroll at any time incident to the trip in question. He had no discussion of employment or wages with Scherff; he was not to be paid by Scherff. Defendant furnished the tractor to be driven by plaintiff and supplied all fuel, oil, maintenance, and repair. Defendant had the right to discharge plaintiff. Scherff's right in this connection was to refuse driver and tractor; Scherff could not replace a driver furnished with the tractor by defendant without defendant's consent. A contract of employment existed between plaintiff and defendant in that defendant called plaintiff to make a run, plaintiff accepted the offer, and, ultimately, plaintiff and defendant agreed that plaintiff would take defendant's tractor and make a run pulling Scherff's trailers. Scherff would pay defendant under the lease agreement between Scherff and defendant; defendant would and did pay plaintiff for driving defendant's tractor.

■ Plaintiff's injuries were sustained on his employer's premises as plaintiff was walking to his car to go home, and thus arose out of and in the course of his employment. Metting v. Lehr Construction Co., 225 Mo.App. 1152, 32 S.W.2d 121 (1930); Garrison v. U. S. Cartridge Co., 197 S.W.2d 675 (Mo.App.1946); Ott v. Consolidated Underwriters, 311 S.W.2d 52 (Mo.App.1958); Lawson v. Village of Hazelwood, 356 S.W.2d 539 (Mo.App.1962).

■ Accordingly, the court did not err in determining the existence of an employee-employer relationship between plain-

tiff and defendant. An employee-employer relationship existed between plaintiff and defendant; and the plaintiff's injury arose out of and in the course of his employment. Plaintiff-employee's exclusive remedy was under the Missouri Workmen's Compensation Law. Anderson v. Steurer, 391 S.W.2d 839 (Mo.1965); § 287.120(1), RSMo 1969, V.A.M.S.

In this effort to remove himself from the Act, appellant contends he was not in the general employment of defendant and cites cases, e. g., Gass v. White Superior Bus Co., supra, Patton v. Patton, 308 S.W.2d 739 (Mo.1958), Schepp v. Mid City Trucking Co., 291 S.W.2d 633 (Mo.App.1956), on his proposition that the right to control plaintiff's actions was in Scherff Truck Lines and that he was the employee of Scherff.

These authorities are not persuasive in this case because they were concerned with which of two employers, the general or special employer, was to be held as the liable employer under the Act; while in this case, the only issue for determination is whether plaintiff was an employee of defendant within the meaning of the Act. In this connection it is appropriate to note that if a situation of dual control exists in two employers, both may be found liable for compensation benefits. Wigger v. Consumers Cooperative Association, 301 S.W.2d 56 (Mo.App.1957).

Appellant's principal reliance is upon Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S.W.2d 119 (1933), on his proposition that he was not defendant's employee and was, therefore, entitled to maintain his common-law action. Simmons was licensed by defendant to ride horses in races at defendant's track. He had to obtain his own mounts from individual owners. He was injured during a race by the negligence of defendant's agent and brought a common-law action for his damages. The court held there was no employee-employer relationship between plaintiff and defendant which would bar such action and limit his remedy to the Workmen's Compensation Act. Plaintiff

would equate the position of defendant Winebrenner with that of defendant Jockey Club; however, the true analogy to be drawn from the cited case would place defendant Winebrenner in the position of the horse owner who employed Simmons to ride and furnished him the mount.

In a further effort to remove himself from the Act, appellant contends he and defendant were joint adventurers engaged in a joint enterprise; and, therefore, there was no employee-employer relationship to bring him under the Act.

In support of his contention appellant cites Bell v. Green, 423 `S.W.2d 724 (Mo. banc 1968); Heald v. Erganian, 377 S.W.2d 431 (Mo.1964); Scott v. Kempland, 264 S.W.2d 349 (Mo.1954); Pigg v. Bridges, 352 S.W.2d 28 (Mo. banc 1961), for their definitions of joint adventure, e. g.: "'A "joint adventure," as a legal concept, is of comparative recent origin, * * * and is founded entirely on contract, either express or implied. It can exist only by voluntary agreement of the parties to it. It has been defined as an "association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." * * * It is in the nature of a partnership, generally governed by the same rules of law, the principal difference being that a joint adventure is usually limited to a single transaction. As a general rule, in order to constitute a joint adventure, there must be a community of interest in the accomplishment of a common purpose, a mutual right of control, a right to share in the profits and a duty to share in the losses as may be sustained.'" Bell v. Green, supra, 423 S. W.2d l. c. 730–731 [6–8].

■ The evidence in this case fails to show in at least three respects the elements necessary to a joint venture:

First, there was no mutual right to control between plaintiff and defendant. Plaintiff only drove defendant's tractor; defendant had the right to remove and discharge him at any time.

Second, plaintiff had no right to share in the profits. Plaintiff was to be paid a wage fixed at 20% of what defendant was to be paid for furnishing tractor and driver; defendant was obliged to pay plaintiff irrespective of receipt of payment from Scherff to defendant.

Third, plaintiff had no duty to share in any losses. Plaintiff had no responsibility in the venture except to drive defendant's tractor pulling Scherff's trailers; defendant owned and controlled the tractor and was responsible for its fuel, maintenance, and repair.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.