Cathy Jean JOHNSON, and Thomas Ray Boatz Johnson and Rebecca Joyce Johnson by their next friend Cathy Jean Johnson, Plaintiffs-Respondents,

v.

PACIFIC INTERMOUNTAIN EXPRESS CO., and Marlo Transport Corporation, Defendants-Appellants.

No. 65102.

Supreme Court of Missouri, En Banc.

Nov. 22, 1983.

As Modified on Denial of Rehearing Dec. 20, 1983.

John E. Price, Harold J. Fisher, Mark E. Gardner and David A. Childers, Glen A. Burkart, Springfield, for defendants-appellants.

Thomas Strong and John Wooddell, Springfield, for plaintiffs-respondents.

BLACKMAR, Judge.

Thomas Johnson was killed November 19, 1978 in a collision in Dallas County between a car in which he was a passenger and a 1978 Kenworth tractor trailer unit, leased by Tabor and driven by Brown. His widow, Cathy, and minor children obtained judgment against Pacific Intermountain Express Co. (P.I.E.) and Marlo Transport Corporation, for $750,000. No issue was preserved as to the negligence of Brown or as to the amount of the verdict. The defendants appealed to the Missouri Court of Appeals, Southern District, which affirmed with one dissent as to P.I.E. We transferred the case and now decide it as on original appeal. We likewise affirm.

The only assertion of trial error is easily disposed of. Cathy, prior to the trial, had married Samuel Lower. She continued to use the name "Cathy Jean Johnson," and on May 1, 1981 the Circuit Court of Webster

County entered an order "reaffirming" that name for her. Before trial of the case the plaintiffs sought and obtained an order in limine, suppressing reference to Cathy's marriage to Lower, to her surname as Lower, and to Lower as her husband. The jurors were questioned on voir dire as to acquaintanceship with Lower, but without identifying him as Cathy's husband, and none responded. There was evidence of "household services" performed by Thomas Johnson, and the defendants sought to introduce evidence of the remarriage to show that Lower was available in Johnson's stead. They also complain of Cathy's use of the name Johnson, citing cases holding that a witness in her situation must answer with her "true" name.[1]

The point is not well taken. A married woman may take a name which is not that of her current husband. *Matter of Natale,* 527 S.W.2d 402 (Mo.App.1975). Cases holding that a witness must give her true name, relying on a cautionary instruction to dispel possible prejudice, are not in point because Cathy answered with her true legal name. The reference to Lower's potential household services in mitigation of damages is no more appropriate than is mention of his potential earnings.[2] The defendants understandably wanted the jury to know about Cathy's remarriage in the hope that they would take this into account in determining damages in spite of any cautionary instructions that might be declaimed. Here no untrue statements were made and the jury was not deprived of any information it had a right to have. No purpose would be served by telling the jurors about the remarriage and then instructing them to disregard the information.

The remaining questions have to do with the vicarious liability of P.I.E. and of Marlo. Each argues vigorously that it is not liable. This requires detailed consideration of the evidence as to the ownership, leasing and operation of the 1978 Kenworth, taken most strongly from plaintiffs' standpoint.

Tabor, a resident of St. Louis, owned or leased two tractors, each of which operated with a trailer in an 18-wheel unit. He secured the services of Brown and of Singleton as drivers, and would sometimes operate with them so as to provide three drivers for the two vehicles. There was a conflict in the testimony as to whether the drivers received fixed compensation or a share of the earnings. Brown, who was apparently the principal operator of the 1978 Kenworth, died of natural causes after the accident in issue, and evidence about the operation of that vehicle came primarily from Singleton.

None of the three had any kind of Interstate Commerce Commission or state authority for the transportation of freight. After the 1978 Kenworth was acquired a pattern of operation was developed in which a load of produce would be picked up on the West Coast and hauled to the East Coast. Agricultural products are exempt commodities which require no operating authority for shipment in interstate commerce.[3] After the produce was unloaded the drivers would look for a westbound load, which would usually involve the leasing of the equipment to a common carrier possessing ICC authority. Leases of this kind are permitted by ICC regulations, under conditions which are very important to this case and will be discussed in detail at a later point. The regular drivers would then drive the loaded vehicle to the destination

1. Defendants cite *Duebelbeis v. Dohack,* 615 S.W.2d 488 (Mo.App.1981) and *Glick v. Allstate Insurance Co.,* 435 S.W.2d 17 (Mo.App. 1968).

2. Missouri courts have consistently held that a cause of action for wrongful death is not abated by remarriage nor may the remarriage be considered in mitigation of damages. *See, e.g., Glick v. Allstate Insurance Co.,* 435 S.W.2d 17, 23 (Mo.App.1968); *Katz v. North Kansas City Development Co.,* 223 Mo.App. 606, 14 S.W.2d

701, 709 (1929); *Platt v. Cape Girardeau Bell Telephone Co.,* 12 S.W.2d 933, 936 (Mo.App. 1929); *Davis v. Springfield Hospital,* 204 Mo. App. 626, 218 S.W. 696, 700 (1920).

3. 49 U.S.C. § 303(b)(6) (1976) (now 49 U.S.C. § 10526(a)(6)(B) Supp. V 1981) provided the exemption from operating authority for the shipment of agricultural commodities in interstate commerce.

specified by the carrier, after which another exempt eastbound load of produce would be sought.

P.I.E. is a major interstate carrier of freight. Although it disclaimed any knowledge at all of any lease or other dealing with Brown, Tabor, or Singleton, the latter two testified to the several trips by the 1978 Kenworth under lease to P.I.E. Singleton told of a visit to a P.I.E. terminal in New Jersey, which had a sign identifying it as such, in which he dealt with a man named Ray Dean, who directed the loading of the trailer and provided advance money for expenses. Dean delivered shipping documents, including a trip lease, which were carried with the vehicle, and signs or placards evidencing operation under P.I.E. authority, which were affixed to the tractor. On the first trip Dean told Singleton that he could either mail the signs in at the end of the trip or bring them back with his next eastbound load. Singleton elected the latter option. There were more westbound trips under P.I.E.'s authority, arranged with Dean. The precise number of these is not clear, but the jury could have found at least three. At the beginning of the second trip another set of signs was furnished. Dean did not ask that these be returned, and at least one of them remained on the truck until the accident. The truckers' copies of the trip leases were apparently discarded at the end of each run. Tabor testified about receiving payments from P.I.E. and dealing with a P.I.E. representative in East St. Louis.

Although the evidence is sketchy, the jury could have found that the 1978 Kenworth made its last westbound trip under P.I.E.'s operating authority 10 or 12 days before the accident, that it carried signs previously furnished by P.I.E., that P.I.E. made no effort to collect the signs at the end of the run, and that at least one sign was on the tractor at the time of the accident. There is no evidence, however, that the fatal trip was carried on under P.I.E.'s authority or with its knowledge, or that P.I.E. had any interest in the revenues. Any claim the plaintiffs have against P.I.E., then, must depend on a constructive agency derived from the federal statutes and regulations adopted by the Interstate Commerce Commission pursuant to those statutes.

The load for the fatal trip was arranged by defendant Marlo Transportation Company, which is a "freight broker." A freight broker exists to put shippers in touch with truck operators. Marlo does not operate trucks and has no ICC or other operating authority. Marlo learned that the 1978 Kenworth was available for a westbound trip, and arranged for a load of steel to be hauled from the plant of Franklin Stainless Corporation in New York to a consignee at Broken Arrow, Oklahoma. An employee of Marlo accompanied the rig to the plant and back to Marlo's place of business in New Jersey. The P.I.E. sign was on the vehicle at the time. The jury could have found that Marlo was aware of the sign and that it knew that this shipment had no connection whatsoever with P.I.E. It could also find that Marlo knew that the shipment would be carried without valid operating authority of any kind, and was indifferent to this absence of authority.

The unit, besides operating without authority, carried a load which was over the weight limits for several states on the route. The drivers selected a route designed to avoid weight stations. Singleton testified that the P.I.E. sign might be helpful in avoiding "policemen and highway patrolmans." There is no evidence that Marlo was aware of the overload, specified the route to be followed, or took note of possible involvements with "the law."

Marlo paid an advance to the drivers before the trip began. There was evidence that Marlo was to collect the freight charges from the shipper or the consignee, retaining 25% and remitting the balance to Tabor. The evidence as to the actual monetary settlement following the accident was not developed, and seems immaterial.

## 1. Marlo's Liability

The issue of Marlo's liability was submitted by an instruction[4] requiring findings on issues now disputed, as follows:

### INSTRUCTION NO. 8

Your verdict must be for plaintiffs Cathy Johnson, Thomas R. Johnson, and Rebecca Johnson and against defendant Marlo Transport Corporation if you believe:

\* \* \* \* \* \*

Second, Lee Brown, Jr., was operating the Kenworth Truck within the scope and course of his agency for Marlo Transport Corporation at the time of the collision, and

\* \* \* \* \* \*

Acts were within the "scope and course of agency" as that phrase is used in this instruction if:

1. They were performed by Lee Brown, Jr. to serve the interests of Marlo Transport Corporation according to an express or implied agreement with Marlo Transport Corporation, and

2. Marlo Transport Corporation either controlled or had the right to control the physical conduct of Lee Brown, Jr.

Marlo argues, vigorously, that there is no evidence that it had control over, or the right to control, Brown as he headed west with the truck. It asserts that it properly retained the proprietor of the truck, (whether Tabor, Brown, Singleton, or some combination of the three) as an independent contractor, to achieve a particular result by means chosen by the contractor, that it had no right to control the truck as to the details of operation, and that there is no basis for vicarious liability. These arguments, if sound, would result in judgment for Marlo notwithstanding the verdict.

Perhaps it will be helpful first to explore the practicalities of the situation rather than the legalities. Marlo was in touch with a customer who had a truckload of steel. It was looking for a truck. Brown and Singleton had a truck provided to them by Tabor, who had leased it, and, with full authority from Tabor, were trying to locate payloads. Marlo and the truckers got together on a proposition to haul a load for Franklin Steel to Broken Arrow, Oklahoma. They did not put the details in writing but rather operated informally. Marlo was to collect from the customer, retain 25%, and remit the balance to Tabor. Nobody seemed to have the least concern about the total absence of operating authority.

Now let us return to the legalities. The arrangement can best be described as a "joint venture." The parties undertook a particular project, for mutual benefit and profit. It makes no difference whether the venturers are Marlo and Tabor, with Brown and Singleton considered to be servants of the venture, or whether Tabor, Brown and Singleton are to be considered as acting together on one side of the venture with Marlo on the other.

A joint venture is a species of partnership.[5] The distinction between a joint venture and a conventional partnership is that the former exists for a particular, defined purpose. Although a joint venture is a consensual arrangement, no particular formalities are necessary. There may perfectly well be a joint venture for a single truck haul.[6] There is a mutual agency among the venturers for activities within the scope of the venture, and all have equal right of control.[7] Venturers, moreover, are

---

**4.** This instruction is based on MAI 13.06.

**5.** See *Howard v. Winebrenner,* 499 S.W.2d 389, 396 (Mo.1973); *Jeff-Cole Quarries, Inc. v. Bell,* 454 S.W.2d 5, 15 (Mo.1970); *Swindell v. J.A. Tobin Construction Co.,* 629 S.W.2d 536, 542 (Mo.App.1981).

**6.** A "joint adventure" is often defined as an association of two or more persons to carry out a single business enterprise for profit. *See*

*Howard v. Winebrenner,* 499 S.W.2d 389, 396 (Mo.1973); *Jeff-Cole Quarries, Inc. v. Bell,* 454 S.W.2d 5, 15 (Mo.1970); *Bell v. Green,* 423 S.W.2d 724, 731 (Mo. banc 1968); *Pigg v. Bridges,* 352 S.W.2d 28, 33 (Mo. banc 1961).

**7.** As a general rule in order to constitute a joint venture there must be a mutual right of control. *Howard v. Winebrenner,* 499 S.W.2d 389, 396 (Mo.1973). *See also supra* note 6.

jointly and severally liable for torts committed within the scope of the venture.[8]

■ Marlo, then, was instrumental in launching and directing the truck journey. This is not a situation in which Marlo should be allowed to escape liability by asserting independent contractor status. Our courts have been hesitant to uphold claims for this kind of immunity. There is a distinct tendency to find that truck operators are agents or servants rather than independent contractors.[9] Marlo's case is not helped by the fact that it did not try to place the load with a regular, certified carrier, having regular routes and published tariffs, but rather did business with itinerant truckers with no semblance of operating authority. It is easier to find an independent contractor relationship when the purported contractor holds itself out to the public as having a regular and established business.[10] But the illegality of the operation is not the controlling circumstance. The usual rule holds those who engage in business for profit liable in damages, on the usual negligence principles, to those who are injured in the course of the business operations. There is no reason to relieve Marlo of this normal and usual liability.

■ Marlo is not being held liable on a theory which was not submitted to the jury. The instruction clearly submitted agency, with its constituent elements of benefit and right of control. Marlo, of course, could not exercise effective control while the truck was on the highway but, as is usual in joint ventures, the participants had their assigned roles in the total project. No showing of right of control over and above that which follows as of course from a showing of joint venture need be made. The in-

struction is supported by the evidence, and the verdict was properly rendered on it.

## 2. P.I.E.'s Liability

The question of P.I.E.'s liability requires a more intricate legal analysis. There is no claim, and no evidence, that the truck was on a mission for P.I.E. at the time of the fatal accident. The plaintiffs, rather, seek to establish the vicarious liability of P.I.E. through the provisions of the Interstate Commerce statutes, and regulations adopted by the Interstate Commerce Commission pursuant to those statutes, governing the use by certified carriers of rolling stock belonging to others.

The verdict directing instruction [11] required findings on disputed issues as follows:

  *   *   *   *   *   *

Second, Pacific Intermountain Express Company leased the truck driven by Lee Brown, Jr. and provided a sign to be displayed on the truck identifying Pacific Intermountain Express Company as the carrier, and

Third, Pacific Intermountain Express Company failed to remove the sign from the truck before the collision of November 19, 1978, and

  *   *   *   *   *   *

All hypotheses of this instruction are supported by the evidence. The question is whether the instruction submits all the contested facts necessary to support a recovery against P.I.E.

Motor carriage of freight in interstate commerce is closely regulated. Regulation of leases of rolling stock by a certified carrier for use in operations under its cer-

---

8. *See supra* note 6.

9. *See, e.g., Madsen v. Lawrence,* 366 S.W.2d 413, 415 (Mo.1963), where this Court held that the trial court did not abuse its discretion in granting a new trial where substantial evidence introduced in the case justified a finding that a driver of a dump truck was a servant rather than an independent contractor in a personal injury suit against the defendant-excavator. Appropriate factors are set out in Restatement

(Second) of Agency § 220 (1958), which our courts have followed with some regularity.

10. *Cf. King v. Young,* 107 So.2d 751 (Fla.App. 1958); *Gross v. Eustis Fruit Co.,* 160 So.2d 55 (Fla.App.1964), involving freight brokers who arranged loads with certified carriers.

11. Based on MAI 13.06, 17.13, 19.01 and 20.02 modified.

tificate is especially strict.[12] One important purpose of the regulatory scheme is to protect persons who are injured in highway accidents,[13] by increasing the likelihood that a substantial entity will be available to respond to any judgment rendered. The federal statute and regulations have been held, in numerous cases from different jurisdictions, to have a definite and substantial impact on tort liability. These holdings are not mandated by any controlling authority from the Supreme Court of the United States, but rather represent the consensus of judicial authority based on analysis of statutory policy and implementing regulations.

This Court has spoken on the subject only in *Brannaker v. Transamerican Freight Lines, Inc.,* 428 S.W.2d 524 (Mo.1968). Both the plaintiff and P.I.E., understandably, try to glean support in *Brannaker* for their respective positions. There the plaintiff sued for damages sustained in a collision with a tractor-trailer unit owned by Murray, but bearing signs indicating operation under the authority of Sykes Transport Company, a certified carrier. Murray had leased the unit to Sykes for two years and customarily drove the truck while hauling freight at Sykes' direction. Sykes and Murray had a disagreement and, after a point, Murray did no more hauling on direct orders from Sykes. The tractor continued to display Sykes' sign, however, and Murray hauled loads for other certified carriers, under trip leases, which were permitted under the lease and governing regulations. The Court found that all trip leases had terminated at the time of the accident. There was disputed evidence as to Sykes' efforts to terminate its lease and to reclaim its licenses and signs. The Court found that there was a jury issue as to whether the lease was still in effect, so that Murray would be operating under Sykes' authority.

The Court also found, in *Brannaker,* a jury issue as to whether Murray, at the time of the accident, was engaged in Sykes' business, or was engaged in a purely personal mission in returning to his home. We held that the maximum effect of ICC regulations would be to make the certified carrier liable as owner, and that the owner would not be responsible for the employee's use of the vehicle in a purely personal mission. This holding is more restrictive of liability than some courts would decree.[14] But this part of the opinion is not pertinent, in the view we take of the case, because here the evidence shows beyond dispute that the unit was hauling regulated dry freight at the time of the accident.

■ P.I.E. argues that it has only trip leases for rolling stock it does not own and that any trip lease for the 1978 Kenworth expired when the cargo reached its distination. Trip leases are valid under the governing statute and regulations only in iso-

12. The regulations codified at 49 C.F.R. § 1057.4 (1978), provide that an authorized carrier may lease non-owned equipment so long as the lease provides for "exclusive possession, control, and use of the equipment" for the duration of the lease. Such leases must specify their duration, which in most circumstances may not be less than 30 days. Regardless of the minimum duration stated in the lease, the carrier is nevertheless obliged to (1) obtain a signed receipt from the lessor for return of the equipment, and (2) remove its identifying signs and placards.

13. In *American Trucking Ass'ns v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953), the United States Supreme Court recognized that the strict regulatory scheme imposed on authorized carriers was designed to provide a financially responsible party to stand behind any interstate trucking operation which negligently injures members of the traveling public. *See also Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975); *Alford v. Major,* 470 F.2d 132 (7th Cir.1972); *Rodriguez v. Ager,* 705 F.2d 1229 (10th Cir.1983).

14. *Schedler v. Rowley Interstate Transportation Co.,* 68 Ill.2d 7, 11 Ill.Dec. 541, 368 N.E.2d 1287 (1977) (carrier was held vicariously liable to the plaintiff for injuries sustained after the trailer had been dropped off at carrier's terminal and the lessor of the tractor was driving it to his home); *Cox v. Bond Transportation, Inc.,* 53 N.J. 186, 249 A.2d 579 (1969), *cert. denied,* 395 U.S. 935, 89 S.Ct. 1999, 23 L.Ed.2d 450 (1969) (carrier was held liable for an accident involving a leased tractor, bearing its decals, while used by the driver for personal transportation).

lated situations, one of which involves back hauling after transporting a load of produce, which enjoys an agricultural exemption.[15] Other leases of rolling stock by a certified carrier must be for a minimum 30-day period. The plaintiffs argue that it must be assumed that there was a minimum 30-day lease which had not expired because P.I.E. did not meet the burden of showing that there was a valid trip lease. In the view we take of the case we do not have to resolve their conflicting positions but rather assume, for purposes of this opinion, that the last journey of the 1978 Kenworth under P.I.E.'s authority was covered by a valid trip lease.

The signs or placards are essential parts of any lease of rolling stock by a certified carrier. They must show the lessee carrier's name and operating number, and must be serially numbered in the carrier's own series.[16] The regulation [17] provides that, at the termination of the trip,

> The authorized carrier operating equipment under this part shall remove any legend, showing it as the operating carrier, displayed on such equipment, and shall remove any removable device showing it as the operating carrier, before relinquishing possession of the equipment.

P.I.E., of course, offered no evidence of any attempt to retrieve the signs, because it disclaimed knowledge of any dealing with Tabor or his associates. *Brannaker* suggests that evidence of such efforts, or of reporting the loss of serially numbered signs to appropriate authorities, would be significant in support of the carrier's theory

that the lease had terminated. *See also Atlantic Truck Lines, Inc. v. Kersey,* 387 So.2d 411 (Fla.App.1980). P.I.E. was operating at a distinct disadvantage in trial after the jury found that there had been a lease of the 1978 Kenworth to it, but we must proceed on the assumption that the signs were furnished and never returned, and that no effort was made to reclaim them.

P.I.E., citing *Brannaker,* argues that the bare existence of a lease and the failure to reclaim the signs following termination is not sufficient to found liability, in the absence of a finding that Brown was operating the truck "within the scope and course of employment by an agency of P.I.E." Judge Flanagan of the Court of Appeals adopted this position. *Brannaker* does support the proposition that the mere presence on a vehicle of a placard furnished by a carrier is not conclusive of the carrier's vicarious liability, but it involves two factual possibilities not here present, as follows: (1) the carrier may have made reasonable efforts to terminate the lease and to reclaim its identifying signs; or (2) the vehicle may have been used on a mission personal to the driver, not involving the hauling of freight for the benefit of the lessee carrier or anyone else, at the time of the accident. There is no basis in the evidence in this case for consideration of either of these theories, or any similar theories.

*Brannaker* emphasizes the great importance of the sign in giving an appearance of operating authority, and other courts have emphasized this circumstance.[18] In *Mellon*

---

**15.** Section 1057.4(a)(3)(i)(B) permits the use of a trip lease when a truck is engaged in the carriage of agricultural commodities exempt under 49 U.S.C. 303(b)(6).

(b) Where the motor vehicle so to be used is one which has completed a movement covered by section 203(b)(6) of the Act and such motor vehicle is next to be used by the motor carrier in a loaded movement in any direction, and/or in one or more of a series of movements, loaded or empty, in the general direction of the general area in which such motor vehicle is based; ...

**16.** 49 C.F.R. § 1057.4(d) (1978).

**17.** 49 C.F.R. § 1057.4(d)(1) (1978).

**18.** *See, e.g., Wellman v. Liberty Mutual Insurance Co.,* 496 F.2d 131 (8th Cir.1974); *Mellon National Bank & Trust Co. v. Sophie Lines, Inc.,* 289 F.2d 473 (3rd Cir.1961); *Cosmopolitan Mutual Insurance Co. v. White,* 336 F.Supp. 92 (D.Del.1972); *Kreider Truck Service, Inc. v. Augustine,* 76 Ill.2d 535, 31 Ill.Dec. 802, 394 N.E.2d 1179 (1979); *Cox v. Bond Transportation, Inc.,* 53 N.J. 186, 249 A.2d 579 (1969); *Leotta v. Plessinger,* 8 N.Y.2d 449, 209 N.Y. S.2d 304, 171 N.E.2d 454 (1960); *Bankers & Shippers Insurance Co. v. New York v. Watson,* 216 Va. 807, 224 S.E.2d 312 (1976).

*National Bank & Trust Co. v. Sophie Lines,* 289 F.2d 473 (3d Cir.1961), frequently cited, a carrier leased a truck from an owner-driver and furnished signs. When the lease was still in effect, the truck, displaying the carrier's signs, was used for an illegal back haul of lumber in which the carrier had no interest. The court found the carrier liable, nonetheless, observing that the presence of the signs made it appear that the shipment was moving under its certificate. That case is similar to this one, but is not completely in point because there a continuing lease was in effect and the parties contemplated shipments by the lessee's order at the conclusion of the illegal back haul.

A very recent case discussing the importance of the signs and consistent with the result we reach is *Rodriguez v. Ager,* 705 F.2d 1229 (10th Cir.1983). Judge Doyle's comprehensive opinion discusses the purpose of the regulatory scheme and analyzes the leading cases.

█ We conclude that the instruction here given properly stated the essential disputed elements of the case and was supported by the evidence. P.I.E. could probably have obtained the signs easily by holding up payment until they were returned. By allowing the trucker to retain the signs, it contributed to the appearance that the unit was operating under P.I.E.'s authority. There is no evidence that Marlo thought that it was arranging a shipment under that authority, or that it dealt with Brown or Singleton because they were apparently able to palm themselves off as having authority from P.I.E., but it is quite possible that a truck with unauthorized signs might be able to attract freight business which would not otherwise fall to it. Singleton's testimony made it very clear, furthermore,

that he considered the sign useful in making it easier to navigate without interference from the constabulary. It may be assumed that checks for the presence of operating authority are made by responsible officials and that signs may be of substantial assistance in avoiding arrest or challenge. Viewed in this light, the requirements of retrieval of a sign has great substantive importance in the regulatory scheme. It is more likely that freight will be carried by certified, responsible carriers if their signs are controlled.

█ We conclude that P.I.E. may be held liable for the truck driver's negligence, without regard to the continuing force of the lease, if the jury finds: (1) that a sign or identifying legend was furnished by the carrier in connection with a lease; (2) that the sign was on the truck at the time of the accident; and (3) that the truck was hauling regulated freight at the time of the accident.[19] Instruction # 7 submitted the first two elements and the jury necessarily found these in reaching its verdict. The instruction might be found deficient, in a vacuum, by not requiring a finding that the truck was hauling regulated freight at the time but, if there is indeed any genuine issue of fact in this matter, it was effectively resolved by the jury's finding that the unit was being operated in Marlo's interest. Only issues of fact which are genuinely in dispute need be submitted to a jury.[20] All instructions must be read together.[21]

The conclusion we reach is based on statutory policy rather than a conventional respondeat superior theory. It is based on the failure to comply with an explicit provision of the governing regulations, designed to identify the responsible carrier and to

19. We do not have to determine whether this element could be satisfied by showing that the unit was being operated in some other way which would facilitate the movement of non-exempt freight, nor do we have to deal with a situation such as was present in *Brannaker* or in *Rodriguez v. Ager, supra,* in which there was evidence of a lease still in effect.

20. *See, Douglas v. Farrow,* 334 S.W.2d 234 (Mo.1960); *Brenham v. McCoy,* 213 S.W.2d 914 (Mo.1948); *Ryan v. Burrow,* 326 Mo. 896, 33 S.W.2d 928 (1930); *Whiteaker v. Chicago, R.I. & P.R. Co.,* 252 Mo. 438, 160 S.W. 1009 (1913), *aff'd in,* 239 U.S. 421, 36 S.Ct. 152, 60 L.Ed. 360 (1915).

21. *See, Smith v. American Bank & Trust Co.,* 639 S.W.2d 169 (Mo.App.1982); *Goodwin v. S.J. Groves & Sons Co.,* 525 S.W.2d 577 (Mo. App.1975).

inhibit the shipment of hot freight, rather than on a holding that the latest lease was not properly terminated. No issue is presented as to the effect of an attempt by P.I.E. to retrieve the signs, as no such attempt was shown by evidence. We of course express no opinion on the effect of failure to comply with the governing regulation in other respects. Nor do we have to decide what P.I.E.'s liability would have been had the truck been operating under lease to another certified carrier at the time of the accident. Our holding centers on the appearance of authority created and maintained when a sign is issued and not retrieved. It was not necessary, then, for the plaintiff to show that the truck was on an actual mission for P.I.E. at the time of the accident. *Rodriguez v. Ager, supra.* P.I.E.'s liability is based on appearances, not on actualities. It is clear that the unit was hauling freight for Franklin, and so the "personal mission" facet of *Brannaker* has no application.

The judgment is affirmed.

RENDLEN, C.J., and GUNN and BILLINGS, JJ., concur.

HIGGINS, J., concurs in part and dissents in part in separate opinion filed.

DONNELLY, J., dissents in separate opinion filed.

WELLIVER, J., dissents in separate opinion filed and concurs in separate dissenting opinion of DONNELLY, J.

WELLIVER, J., withdraws previously filed dissent and files substitute dissenting opinion and concurs in separate dissenting opinion of DONNELLY, J., on December 20, 1983.

HIGGINS, Judge, concurring in part and dissenting in part.

I concur in the opinion insofar as it affirms plaintiffs' judgment against Marlo Transport Corporation.

I cannot join the opinion in its affirmance of plaintiffs' judgment against Pacific Intermountain Express Company because I cannot find any evidence to show defendant vicariously liable to the plaintiffs.

The majority opinion concedes there is no evidence that the fatal trip was carried on under P.I.E.'s authority or its knowledge or that it had any interest in the revenues connected to the trip.

The case against P.I.E. was submitted on a theory that failure of P.I.E. to remove an identifying sign covering a previous bona fide lease somehow provided the evidence of vicarious liability otherwise lacking. It is undisputed that there was no lease or other enterprise arrangement existing between P.I.E. and Tabor to provide a right of control on the trip in question as a basis for vicarious liability.

In these circumstances, plaintiffs failed to make a submissible case against P.I.E. and the judgment against it should be reversed.

DONNELLY, Judge, dissenting.

Today, the Court ignores settled Missouri law and implants, again without a rationale, a scheme for redistribution of property. *See Virginia D. v. Madesco Investment Corp.,* 648 S.W.2d 881 (Mo. banc 1983).

The principal opinion holds P.I.E. vicariously liable on the basis of a regulation adopted by the Interstate Commerce Commission and governing leases of rolling stock by a certified carrier. In so doing, it imposes a liability on P.I.E. when using leased equipment greater than its liability when operating its own equipment. I cannot agree.

The essential questions in this case are (1) whether P.I.E. is vicariously liable under the Missouri doctrine of joint enterprise; and (2) whether Marlo is vicariously liable under the Missouri doctrine of joint enterprise.

In *Herrell v. St. Louis-San Francisco Ry. Co.,* 324 Mo. 38, 45, 23 S.W.2d 102, 105 (banc 1929), this Court declared " 'that negligence in the conduct of another will not be imputed to a party if he neither authorized such conduct, nor participated therein, nor had the right or power to control it.' " *See*

Restatement (Second) of Torts § 491, Comments b & c (1965).

In my view, respondents failed to make a submissible case.

I respectfully dissent.

WELLIVER, Judge, dissenting.

I respectfully dissent. The Court today strains prior conceptions of vicarious liability in order to uphold plaintiffs' judgment against defendants. Unquestionably, plaintiffs have suffered a tragic wrong, but it is apparent to me that the tortfeasor is not before the Court. While I emphathize with plaintiffs, I cannot subscribe to assessing tort "liability ... based on appearances, not on actualities." Appearances have nothing to do with who caused or may have been responsible for plaintiffs' injuries and damages. Because I cannot justify holding parties so remotely related to a negligent act responsible, I would reverse the judgment rendered against both Pacific Intermountain Express (P.I.E.) and Marlo Transport Corp. (Marlo).

The Court defends the judgment against P.I.E. on the basis of a contrived agency relationship imposed by the Court as a matter of policy, theoretically to promote the objectives of a federal regulatory scheme. We previously have interpreted the Interstate Commerce Commission (I.C.C.) regulations relied on in this case as imposing no greater degree of liability "than the carrier's liability for the negligence of its driver when operating its own equipment." *Brannaker v. Transamerican Freight Lines, Inc.*, 428 S.W.2d 524, 529 (Mo.1968). It is apparent that, despite its claims to the contrary, the majority has rejected the teaching of *Brannaker* and in its stead, has embraced a view that the court defined policy objectives underlying the regulatory scheme warrant imposing something resembling strict liability for trucking carriers.

I believe the majority's decision is neither supported by the law of this state nor justifiable as a matter of policy. I believe we are compelled to look to the law of this state when determining whether P.I.E. is liable for the truck driver's negligence.

Our federal Constitution leaves to the control of state authorities the regulation of civil relationships of the type encompassed by the law of agency. Because of the absence of any state legislation modifying the relationship between P.I.E. and the truck driver involved in the accident, this Court should utilize this state's common law of agency. It is clear that under the doctrine of respondeat superior this defendant could not be found liable.

The majority tacitly concedes this fact, but nevertheless affirms the judgment against P.I.E. for policy reasons. I do not believe it is desirable to hold interstate trucking carriers, such as P.I.E., liable under the circumstances of this case. The imposition of liability because of the presence of a placard on the truck will not encourage carrier-lessees to lease equipment from safer operators. Rather, it will lead only to stricter control of identification placards. This is not a valid reason for abandoning this state's long established rules of agency.

The Court's decision with respect to Marlo is equally tenuous. We previously have described a joint venture as an "association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." *Bell v. Green*, 423 S.W.2d 724, 731 (Mo. banc 1968), quoting 48 C.J.S. *Joint Adventures* § 1a. *Bell* further provides that "[a]s a general rule, in order to constitute a joint adventure, there must be a community of interest in the accomplishment of a common purpose, a mutual right of control, a right to share in the profits and a duty to share in the losses as may be sustained." 423 S.W.2d at 731. *See also Howard v. Winebrenner*, 499 S.W.2d 389, 396 (Mo.1973). I do not believe the evidence in the record supports the majority's conclusion that Marlo was participating in a joint venture as our prior decisions have defined that term.

In analyzing Marlo's culpability, it is necessary to understand the nature of its business. As a "freight broker," Marlo assisted

in locating available truckers for companies needing materials shipped. In return for a percentage of the shipping fee, Marlo placed truckers in contact with its clients. Under this arrangement, Marlo earned its fee upon obtaining a truck to haul the freight. While Marlo may have had a commercial interest in seeing its client's freight delivered, it had no legal interest at stake with respect to the fee once the trucker agreed to haul freight. Because Marlo's participation in the transaction ended at this point, the Court errs when it finds that "[t]he parties undertook a particular project, for mutual benefit and profit." 662 S.W.2d at 241.

Nor do I see any basis whatsoever for the finding that Marlo had an "equal right of control." *Id.* at 241. There is positively no evidence in the record to support a conclusion that Marlo, through the exercise of reasonable care, could have controlled the operation of the truck. On the contrary, the degree of autonomy with which the driver of the truck in this case chose his route convinces me that he acted as an independent contractor. The Court notes that "[t]his is not a situation in which Marlo should be allowed to escape liability by asserting independent contractor status," 662 S.W.2d at 242, citing Marlo's dealings with a trucker operating without proper I.C.C. registration. If the Court truly intends to assess tort liability on the basis of "appearances, not on actualities," then I believe it is somewhat incongruous to state on the one hand that a truck bearing P.I.E.'s placard was thereby leased to P.I.E. at the time of the accident but that, on the other hand, the same truck bearing the same placard lacked I.C.C. certification at the time of Marlo's involvement with it.

The result reached by the majority cannot be viewed as other than basing liability for damages on the depth of the defendant's pocket without regard to the degree of defendant's fault.

I also concur in the dissent of DONNELLY, J.